**LOUISIANA ASSOCIATION OF INDE-PENDENT PRODUCERS AND ROY-ALTY OWNERS, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**Algonquin Gas Transmission Company, ANR Pipeline Company, Bay State Gas Company, et al., Brooklyn Union Gas Company, Central Hudson Gas & Electric Corporation, CNG Transmission Corporation, Iroquois Gas Trans-**

mission System, L.P., Long Island Lighting Company, New England Power Company, New Jersey Natural Gas Company, Public Service Electric & Gas Company, Tennessee Gas Pipeline Company,

Texas Eastern Transmission Corporation, Transcanada Pipelines Limited, Intervenors.

NEW ENGLAND FUEL INSTITUTE, Empire State Petroleum Association, and Fuel Merchants Association of New Jersey, Petitioners,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent,

Algonquin Gas Transmission Company, ANR Pipeline Company, Bay State Gas Company, et al., Brooklyn Union Gas Company, Central Hudson Gas & Electric Corporation, CNG Transmission Corporation, Consolidated Edison Company of New York, Inc., Granite State Gas Transmission, Inc., Iroquois Gas Transmission System, L.P., Long Island Lighting Company, New England Power Company, New Jersey Natural Gas Company, Public Service Electric & Gas Company, Tennessee Gas Pipeline Company, Texas Eastern Transmission Corporation, Transcontinental Gas Pipe Line Corporation, Intervenors.

Anne Marie MUESER and GASP Coalition, Petitioners,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent,

Algonquin Gas Transmission Company, ANR Pipeline Company, Bay State Gas Company, et al., Brooklyn Union Gas Company, Central Hudson Gas & Electric Corporation, CNG Transmission Corporation, Granite State Gas Trans-

mission, Inc., Iroquois Gas Transmission System, L.P., Long Island Lighting Company, New England Power Company, Public Service Electric & Gas Company, New Jersey Natural Gas Company, Tennessee Gas Pipeline Company, Texas Eastern Transmission Corporation, Transcanada Pipelines Limited, Transcontinental Gas Pipe Line Corporation, Intervenors.

TEXAS EASTERN TRANSMISSION CORPORATION, Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent,

ANR Pipeline Company, Brooklyn Union Gas Company, CNG Transmission Corporation, Consolidated Edison Company of New York, Inc., Long Island Lighting Company, Louisiana Association of Independent Producers and Royalty Owners, ProGas Limited, Tennessee Gas Pipeline Company, Transcanada Pipelines Limited, Intervenors.

STATE OF LOUISIANA, Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent,

Algonquin Gas Transmission Company, ANR Pipeline Company, Bay State Gas Company, et al., Burk Royalty Company, Brooklyn Union Gas Company, Central Hudson Gas & Electric Corporation, Convexx Oil and Gas, Inc., Elsbury Production, Inc., Robert P. Evans, Harvey E. Yates Company, Kingdon R. Hughes, Independent Oil and Gas Association of West Virginia, Iroquois Gas Transmission System, Long Island Lighting Company, Natural Gas Anadarko Company, New England Power Company, the Southern Connecticut Gas Company, State of Oklahoma, Tennessee Gas Pipeline Company, Texas

Eastern Transmission Corporation, J. Cleo Thompson & James Cleo Thompson, Jr., Transcanada Pipelines Limited, Union Texas Petroleum, Wolverine Gas and Oil Company, Inc., Intervenors.

Nos. 91–1026 to 91–1028, 91–1081 and 91–1160.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 5, 1991.

Decided March 10, 1992.

Gary J. Klein, with whom J. Cathy Fogel, Washington, D.C., for New England Fuel Institute, Empire State Petroleum Ass'n and Fuel Merchants Ass'n, of New Jersey, Robert C. Platt, Washington, D.C., for Louisiana Ass'n of Independent Producers and Royalty Owners, and Anne Marie Mueser for Anne Marie Mueser and GASP Coalition were on the joint brief, for petitioners in 91–1026, 91–1027, and 91–1028, and intervenors in 91–1081.

David B. Robinson, with whom Duane A. Siler and Robert C. Platt, Washington, D.C., were on the joint brief, for petitioners, State of La. in 91–1160 and Louisiana Ass'n of Independent Producers and Royalty Owners in 91–1026 and for intervenors, Elsbury Production, Inc., Burk Royalty Company, J. Cleo Thompson and James Cleo Thompson, Jr., Natural Gas Anadarko Co., Wolverine Gas and Oil Co., Inc., Convexx Oil and Gas, Inc., Independent Oil and Gas Ass'n of West Virginia, Kingdon R. Hughes, Robert P. Evans, Union Texas Petroleum Co., Harvey E. Yates Co. and State of Oklahoma in 91–1160.

Judy M. Johnson, Houston, Tex., for petitioner, Texas Eastern Transmission Corp. in 91–1081 and intervenor, Algonquin Gas Transmission Co. in 91–1026, 91–1027, 91–1028 and 91–1160. Paul A. Biancardi, Houston, Tex., and Rebecca S. Haney, Washington, D.C., also entered appearances for petitioners.

Jerome M. Feit, Solicitor, F.E.R.C., with whom William S. Scherman, Gen. Counsel,

Timm L. Abendroth and Randolph Lee Elliott, Attys., Washington, D.C., were on the brief, for respondent in 91–1026, 91–1027, 91–1028, 91–1081, and 91–1160.

Frederick M. Lowther, with whom Ernest B. Abbott, Frederic G. Berner, Jr., and Alan C. Geolot, Washington, D.C., were on the joint brief, for intervenors, Iroquois Gas Transmission System, L.P. and Tennessee Gas Pipeline Co. in 91–1026, 91–1027, 91–1028, 91–1081, and 91–1160. Johannes W. Williams and Carl M. Fink, Washington, D.C., also entered appearances for intervenors.

J. Gordon Pennington and Daniel F. Collins, Washington, D.C., entered appearances for intervenor, ANR Pipeline Co. in 91–1026, 91–1027, 91–1028, 91–1081, and 91–1160.

Carl Ulrich, Stephen E. Williams, and Mark D. Colley, Washington, D.C., entered appearances for intervenor, CNG Transmission Corp. in 91–1026, 91–1027, and 91–1028.

Nancy A. White, Paul H. Keck and Robert I. White, Washington, D.C., entered appearances for intervenor, Transcanada Pipelines Limited in 91–1026, 91–1028, 91–1081, and 91–1160.

Alfred Winchell Whittaker, Washington, D.C., entered an appearance for intervenor, New England Power Co. in 91–1026, 91–1027, 91–1028, and 91–1160.

Barbara K. Heffernan and Bruce B. Glendening, Washington, D.C., entered appearances for intervenors, Bay State Gas Co., et al. in 91–1026, 91–1027, 91–1028, and 91–1160.

Thomas F. Brosnan, Washington, D.C., entered an appearance for intervenor, Granite State Gas Transmission, Inc. in 91–1027 and 91–1028.

John W. Ebert, Robert G. Hardy and Anthony J. Ivancovich, Washington, D.C., entered appearances for intervenor, Transcontinental Gas Pipe Line Corp. in 91–1027 and 91–1028.

Steven J. Kalish, William I. Harkaway, Washington, D.C., Barbara M. Gunther, New York City, and Donald Stanber en-

tered appearances for intervenor, Consolidated Edison of New York, Inc. in 91–1027 and 91–1081.

Paul W. Fox, Washington, D.C., entered an appearance for intervenor, ProGas, Limited in 91–1081.

J. Richard Tiano, Bridgeport, Conn., entered an appearance for intervenor, Southern Connecticut Gas Co. in 91–1160.

Before MIKVA, Chief Judge, SILBERMAN and RANDOLPH, Circuit Judges.

Opinion for the court filed PER CURIAM.

PER CURIAM:

The Iroquois/Tennessee Project is part of a billion dollar plan to ship natural gas from Alberta across the Canadian prairie to the Northeastern United States. Participants in the plan have sought licenses, certifications, and authorizations before numerous state, federal, and Canadian regulatory bodies. In this case, three groups of petitioners challenge the Federal Energy Regulatory Commission's certification of the American transportation component, a 370–mile pipeline extending from the Canadian border in upstate New York to Long Island. The first group consists of a coalition of upstate New Yorkers concerned about the environmental effects of the pipeline and fuel oil dealers from New England and Louisiana (the "Coalition"). They challenge the certification on the ground that the Commission reached its decision unfairly, improperly, and in violation of due process. The second group of petitioners are domestic oil and natural gas producers led by the State of Louisiana (the "domestic producers"). They argue that the Commission should have adjusted the rates of the proposed pipeline to compensate for what they allege to be the anticompetitive effects of Canadian rate designs. The final petitioner, the Texas Eastern Transmission Company, is one of the domestic pipelines involved in the project. It seeks review of FERC's refusal to grant it a case-specific certificate. Finding none of these petitions persuasive, we deny them.

I

The Iroquois pipeline begins in Iroquois, Ontario, and proceeds across the St. Lawrence River, eastern New York State, western Connecticut, and Long Island Sound, ending near South Commack, Long Island. The pipeline interconnects with a Canadian pipeline at its origin, with the Long Island Lighting Company's pipeline at its terminus, and with the Tennessee Gas Pipeline Company's system at two points along the way. To serve customers not directly linked to either the Iroquois or its own system, Tennessee plans to build some 140 miles of pipeline loops and laterals. The Tennessee system is connected to pipeline facilities operated by Algonquin Gas Transmission Company, which plans to build another 45 or so miles of loops and laterals to serve both customers importing gas from Canada and those shipping domestic gas through the ANR project. *See infra* p. 1108. To accommodate several New Jersey customers of the Iroquois/Tennessee Project, Texas Eastern plans to exchange domestic gas shipped on its pipeline for imported gas shipped on the Iroquois.

Once fully operational, the Iroquois/Tennessee Project will serve 17 local distribution companies (LDCs), three cogeneration customers, and one electric generation customer on a firm or continuous basis and provide interruptible service to an indeterminate number of other customers. Six of these LDCs, as well as Tennessee and Texas Eastern, have interests in the Iroquois Limited Partnership, the owner of the Iroquois pipeline. The other interests are held by domestic pipeline companies, the Power Authority of the State of New York, a Canadian natural gas supplier, and a Canadian pipeline.

The Commission's consideration of the Iroquois pipeline was, at least at first, unhurried. A group of LDCs, domestic pipelines, and a Canadian supplier first sought certification for the original Iroquois pipeline project—a 360–mile line serving 11 LDCs on a firm basis—in May of 1986. Rather than consider these applications, the Commission instituted an "open sea-

son" on Northeast pipeline projects. Several years earlier, the Commission had considered a similar application for a pipeline that was part of a plan to ship natural gas from Alberta to the New York metropolitan region. Those proceedings became unwieldy because competitive proposals, necessitating comparative evidentiary hearings under *Ashbacker Radio Corp. v. FCC*, 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945), were filed throughout the deliberations, thereby rendering the original application "an administrative procedural moving target." *Northeast U.S. Pipeline Projects*, 40 F.E.R.C. ¶ 61,087, at 61,239 (1987). Determined to avoid these problems with the Iroquois application and to "act efficiently and expeditiously," the Commission announced on July 24, 1987, that anyone wishing a competitive evidentiary hearing on a project in the Northeast would have to file their application by December 1, 1987. *Id.* at 61,238. After extending the deadline to January 15, 1988, the Commission gathered the applications, divided them into different project proposals, and determined which of those proposals were competitive and therefore entitled to a comparative hearing. *Northeast U.S. Pipeline Projects*, 42 F.E.R.C. ¶ 61,332, at 61,947 (1988). Thereafter, the applicants entered into settlement discussions; to encourage them, the Commission appointed a settlement judge. *Northeastern U.S. Pipeline Projects*, 44 F.E.R.C. ¶ 61,150, at 61,431 (1988).

After nearly a hundred conferences and meetings, the sponsors of the thirteen projects finally found to be competitive settled. They agreed to withdraw their various proposals and pursue three discrete joint projects: the ANR, the Champlain, and the Iroquois/Tennessee. *Northeast U.S. Pipeline Projects*, 46 F.E.R.C. ¶ 61,012, at 61,063 (1989). The ANR Project promised to increase access to domestic supplies by building a lateral from a pipeline in the Midwest to pipelines serving New England. The Champlain Project proposed to import gas from Quebec into New England via a 340–mile pipeline starting in Vermont at the Canadian border. The Iroquois/Tennessee Project largely tracked

the original proposal for the Iroquois pipeline, modifying it slightly by extending the main pipeline some ten-odd miles and attaching various loops and laterals to it in order to serve more LDCs and to connect the Project with domestic supplies shipped through the Midwest. In accordance with the settlement, Iroquois, along with its new partners, Tennessee, Algonquin, and Texas Eastern, dismissed their pending applications and filed new ones constituting the Iroquois/Tennessee Project. When the Champlain project was abandoned, the Iroquois/Tennessee Project absorbed several additional LDCs.

Because its focus and purpose was procedural, the Northeast open season did not resolve any of the "public interest issues, including the firmness of supply and demand," relevant to the Project. *Id.* at 61,069. Nevertheless, consideration of these issues began well before the Iroquois/Tennessee Project applications were submitted. Under state law, the LDCs planning to purchase gas from Canada had to obtain approval from the relevant state regulatory agencies. Some of the hearings before these bodies were quite lengthy; the New York Public Service Commission proceedings lasted three years. There were also hearings before the Department of Energy's Fossil Energy office (DOE/FE), where the LDCs applied for import authorization, *Brooklyn Union Gas Co.*, 1 F.E. ¶ 70,285 (1990), and before Canada's National Energy Board for, among other things, export authorization. Nor was the Commission entirely quiescent during the open season proceedings. In the spring and summer of 1988, it requested data from the LDCs on their expected demand for natural gas and held a technical conference on the general topic of demand in the Northeast. *Northeast U.S. Pipeline Projects*, 44 F.E.R.C. at 61,427. Six months earlier, the Commission had begun assembling data for its environmental impact statement.

Once the present applications were submitted, the level of activity before the Commission increased. The Commission repeatedly requested updated market data from the LDCs, until in the end there were

eleven such requests, and it held another technical conference in November 1989. Parties also filed protests and comments, 142 in all, and on July 17, 1990, the Commission heard oral argument on the Project.

On July 30, 1990, the Commission issued a preliminary opinion. *Iroquois Gas Transmission Sys.*, 52 F.E.R.C. ¶ 61,091 (1990) [hereinafter, "Preliminary Order"]. Despite the massive record before it, the Commission was not ready to rule on the Project. In the first place, it found Algonquin's application incomplete because Algonquin had failed to specify which of its facilities would serve the Iroquois/Tennessee Project and which would serve the ANR Project. Accordingly, the Commission refused to consider Algonquin's application, and the parts of Tennessee's dependent upon it, until the application was complete.

By contrast, the Commission not only found the applications in what it termed Phase I of the Project complete; it determined that all disputed factual matters could be resolved based upon the written record. Nevertheless, over Commissioner Moler's dissent, the Commission chose not to issue a final ruling on Phase I. Instead, it announced that due to

> the unprecedented level of public comment, input and concern which has been generated by these applications, and based upon the fact that the short delay associated with an expedited and narrowly focused hearing should not, in and of itself, adversely affect the project, it is the desire of the Commission for public policy reasons to give all parties in the proceeding another opportunity to air their concerns.

*Id.* at 61,343. The Commission was rather vague about its "public policy reasons." It apparently thought that the additional, expedited hearings, while not greatly delaying the Project, would enable the Commission to "deal fairly with how competitors use the regulatory process to influence and affect competitive outcomes." *Id.* at 61,371. The Commission may also have been influenced by the prospect that "a trial-type hearing would help citizens to better evaluate this project." *Id.* at 61,366.

The Commission ordered the administrative law judge (ALJ) conducting the hearing to submit findings of fact within forty-five days of its order. *Id.* at 61,343. The Commission also limited the hearing to two issues—the market to be served by the proposed project and the rates for its proposed services—and delineated the issues to be considered under those topics, including the "reasonableness of the assumptions behind the projected growth rates" and the "[a]ppropriateness of the Modified Fixed–Variable rate design" proposed by Iroquois. *Id.* The Commission also fixed the starting point for the hearing by stating its "current views" on the Northeast's need for expanded supplies and on the proposed rate design. By doing so, the Commission hoped "to focus the hearing and to give the parties a meaningful opportunity to challenge or support those views." *Id.* at 61,344.

Although the Commission admonished the parties not to waste their limited time "arguing that the expedited nature of the proceedings is inadequate," *id.*, the Coalition petitioners did just that. Primarily, they argued that they needed to discover the assumptions underlying the market projections submitted by the LDCs and credited by the Commission. When he first heard these complaints at the pretrial conference on August 7, 1990, the ALJ was surprised. These issues, he observed, had not "sprang up out of Zeus's head this morning." Joint Appendix (J.A.) 293. He nonetheless allowed some discovery. This did not satisfy the Coalition petitioners, who sought further discovery when the hearing was convened a week later. Though expressing sympathy for the Coalition petitioners' desire for more discovery, the ALJ denied most of their requests on the grounds that the information they sought was already in the record, and would have been available to them if they had spent the time and energy to gather it, and that further discovery would upset the deadlines imposed by the Commission.

The hearing before the ALJ lasted for ten days, with opponents of the Project first offering evidence to rebut the Commission's current views. After reviewing proposed findings of fact, the ALJ found a need for the Project, primarily because the market projections credited by the Commission remained the most reasonable ones before him. The ALJ refused, however, to consider the main challenge to the proposed rates. While most American pipelines employ a modified fixed variable rate design, Canadian pipelines do not. The difference between these rate designs, the domestic producers argued, gives Canadian gas an anticompetitive advantage over domestic supplies. Finding it unclear as a matter of law whether the Commission could take such a matter into account, the ALJ refused to consider this argument. On review of the ALJ's findings, the Commission agreed that the issue was a legal one. The Commission held that, because it does not consider rate differentials in the domestic context, it could not consistent with the United States/Canada Free Trade Agreement consider any "rate tilt" caused by Canadian rate designs. *Iroquois Gas Transmission Sys.*, 53 F.E.R.C. ¶ 61,194, at 61,702–10 (1990) [hereinafter, "Order No. 357"]. The Commission also affirmed its previous finding of market need. *Id.* at 61,694–98. Because it had already found the Project to be in other respects in the public interest, the Commission granted Iroquois and Tennessee certificates of public convenience and necessity authorizing construction of Phase I of the Project. Upon rehearing, the Commission affirmed that determination. *Iroquois Gas Transmission Sys.*, 54 F.E.R.C. ¶ 61,103 (1991) [hereinafter, "Order No. 375A"].

## II

The Coalition petitioners assail the Commission's decision on a large number of essentially procedural grounds set forth in the margin.[1] The Coalition accuses the

---

1. The Coalition petitioners present the following "facts specifically relevant to procedural fairness":

—Under the guise of procedural housekeeping, [the Commission] ordered the appointment of a settlement judge to decide which, if any, of the competing project applications submitted in the "Open Season" were designed to serve discrete markets and therefore could avoid any comparative review.

—In implementing this assignment, the Chief ALJ, refusing to place *ex parte* conversations on the record, met only with pipeline advocates to devise a settlement, denying requests for discovery and hearing until subsequent proceedings.

—During March and April 1990, at least one Commissioner and various senior decision-making Commission staff conducted substantive *ex parte* meetings with senior executives of Iroquois owners and proponents.

—Although requests for discovery and hearing were initially made in July 1986, and renewed requests were made during the Open Season proceeding, and on the current application in February 1989 and thereafter, the Commission did not act upon any of these requests until July 30, 1990, follow[ing] disclosures of *ex parte* meetings and a Senate hearing concerning the procedures and issues involved.

—The July 30 Order specifically limited discovery because of the expedited schedule— even though petitioners had never previously had access to information known only to Iroquois proponents.

—The July 30 Order denied [a] hearing on key issues of disputed material fact, including available alternatives to the project.

—The July 30 Order set forth the Commission's "Current Views on Issues Set for Expedited Hearing," thus giving its opinion on disputed issues of material fact prior to the hearing.

—The July 30 Order established these "current views" as the "starting point" for the hearing, and directed the parties to "challenge or support" the "current views," thus shifting the burden of proof and persuasion from Iroquois to the Petitioners.

—FERC presented no witnesses to support its current views, and refused to answer any data requests concerning its current views.

—The July 30 Order advised the ALJ that no hearing was needed, that there was already sufficient basis in the record to grant a certificate, and that a hearing was only being ordered for "public policy" purposes.

—The July 30 Order required completion of the entire fact finding process—pre-hearing conference, discovery, hearing, briefing and ALJ decision within 45 days—even though FERC could have acted on pending requests for hearings more than 18 months earlier and even though no emergency existed.

—In reliance on the July 30 Order, the ALJ denied Petitioners essential discovery and cross-examination, because of the expedition required, even though he recognized its relevance.

—Because of the shift in the burden of going forward and the expedition imposed, Petition-

Commission of never seriously considering opposition to the Project. Instead, the Coalition asserts, the Commission conducted a sham certification proceeding in a sort of myopic determination to protect its "regulated constituency" and to "put pipe into the ground." These bold accusations are without foundation in the record. While the Coalition lists a number of instances of alleged unfairness, it suggests relatively few legal errors, none of which survives close attention. The Coalition cannot, by sheer multiplication of innuendo, overcome the strong presumption of agency regularity. *See, e.g., Withrow v. Larkin,* 421 U.S. 35, 55, 95 S.Ct. 1456, 1468, 43 L.Ed.2d 712 (1975); *United States v. Morgan,* 313 U.S. 409, 421, 61 S.Ct. 999, 1004, 85 L.Ed. 1429 (1941). Despite all their sound and fury, the attacks of the Coalition ultimately prove impotent.

### A

■ The Coalition begins its litany of procedural complaints by accusing the Commission of engaging in *ex parte* meetings with Iroquois proponents during both the Northeast open season and the Iroquois/Tennessee certification proceedings. However, as both the Commission and Iroquois observe, the Coalition never actually argues that these meetings were improper

ers were required to present their first witness only seven days after the prehearing conference, prior to hearing the case of Iroquois proponents or Commission staff, and without discovery on the impending direct case of the Iroquois proponents or the factual under-pinnings of the Commission's "current views." —The Iroquois witness presented, as the principal basis of his testimony, a study prepared by Iroquois' 17 LDC shippers who were not present to testify and who could not be deposed because of lack of time. Discovery and cross-examination on assumptions made by the preparers of the only study on market needs and alternatives was denied. —Because of the extraordinary expedition, Petitioners had one evening to prepare their cross-examination of the Iroquois witness and were required to present rebuttal testimony the day after the Iroquois witness completed his testimony. —The Commission reaffirmed its "current views" based upon a finding that Petitioners' market projections [were not] "constructed on a forecast with more reasonable bases than

or that they tainted the proceedings below. As both the Commission and Iroquois observe, the Coalition does not actually argue that the rulings below should be set aside solely on the basis of these contacts. Instead, the Coalition appears to cite the *ex parte* contacts as evidence of procedural unfairness. Upon analysis, however, the record does not sustain the Coalition's charge. The only evidence in the record of the meetings is in the Northeast open season opinions and in a memorandum from the General Counsel detailing the information he "sought and ... obtained from the Commission officials who participated" in meetings during the pendency of the Project application. Preliminary Order at 61,428.[2] Although these sources confirm that there were informal communications between the Commission and parties to the proceeding below, including members of the Coalition, they also indicate that these discussions did not relate to the merits of the Project and that the petitioners suffered no prejudice from them.

■ With respect to the Northeast open season proceedings, the ALJ did meet with Iroquois, Tennessee, and other competing applicants, but he did so in order to facilitate settlement. *See supra* p. 1108. The Coalition was not part of those meetings for a simple reason: they had no competing

those accepted by the Commission as its current view" without ever permitting examination of those current views.
Coalition Brief at 11–14 (footnotes & citations omitted).

2. After oral argument, the Coalition lodged with the court a report prepared by the General Accounting Office regarding the meetings covered by the General Counsel's memorandum. The Coalition has not requested a remand to the Commission for further evidentiary proceedings in light of the report. 15 U.S.C. § 717r(b). With respect to our review of the Commission's factual determinations, we cannot and do not consider the GAO report. We are limited to determining whether the Commission's findings are supported by substantial evidence contained in the administrative record. *See, e.g., Edison Elec. Inst. v. OSHA,* 849 F.2d 611, 623 n. 16 (D.C.Cir.1988); *see also Association of Data Processing Serv. Orgs. v. Board of Governors of the Fed. Reserve Sys.,* 745 F.2d 677, 684 (D.C.Cir. 1984). The GAO report is not part of that record.

application to settle. Nor were there any "public interest" issues at stake in the open season. *Northeast U.S. Pipeline Projects,* 46 F.E.R.C. at 61,069. As mentioned above, the open season was a purely proce-. dural device designed to avoid unnecessarily complicated competitive hearings. Neither of the two evils most commonly associ- · ated with *ex parte* contacts apply in such circumstances. By letting a judge supervise settlement agreements, parties do not engage in "[s]urreptitious efforts to influence an official charged with the duty of deciding contested issues upon an open record in accord with basic principles of our jurisprudence." *WKAT, Inc. v. FCC,* 296 F.2d 375, 383 (D.C.Cir.1961). In a settlement or in a purely procedural proceeding such as the open season, there are no issues to be decided "upon an open record in accord with basic principles of our jurisprudence." Similarly, because there is no judicial review of settlement negotiations, an ALJ's involvement in settlement negotiations cannot impede such review by creating "one administrative record for the public and this court and another for the Commission and those 'in the know.'" *Home Box Office, Inc. v. FCC,* 567 F.2d 9, 54 (D.C.Cir.), *cert. denied,* 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977).

 The Coalition's complaints about the meetings in March and April of 1990 also are without support in the record. Although the meetings took place during the pendency of this proceeding, there is no evidence in the record, other than a single, quickly reproached comment, of any discussion going to the merits of the Project applications. The meetings focused instead upon the impact of cases pending at that time before this court, upon general problems in the industry, and upon the procedural status of the Iroquois application. Such discussions are not prohibited by the mere fact an application is pending. The

Administrative Procedure Act bars *ex parte* communications only if they are "relevant to the merits of the proceeding." 5 U.S.C. § 557(d)(1)(A). Other communications, including inquiries into the. procedural status of the case or general background discussions, are not prohibited. *See, e.g., Professional Air Traffic Controllers Org. v. FLRA,* 685 F.2d 547, 563 (D.C.Cir.1982).

Moreover, acting upon the chance that the industry representatives were attempting subtly and indirectly to influence the outcome of this proceeding,[3] the Commission wisely placed summaries of these meetings in record. By doing so, it apprised the petitioners of any argument that may have been presented privately, thereby maintaining the integrity of the process and curing any possible prejudice that the contacts may have caused in this case. 5 U.S.C. § 557(d)(1)(C) & (D); *PATCO v. FLRA,* 685 F.2d at 565 & n. 36; *Sierra Club v. Costle,* 657 F.2d 298, 398–99 (D.C.Cir.1981).

 By the same token, the Commissioners involved in those meetings properly refused to disqualify themselves due to these contacts. Because the record reveals at best subtle and indirect attempts to influence Commission officials, no disinterested observer would infer that those officials had in any measure prejudged the applications. *Cinderella Career & Finishing Schools v. FTC,* 425 F.2d 583, 591 (D.C.Cir. 1970). It is expected that administrative officials will build up expertise through experience with recurring issues. *FTC v. Cement Inst.,* 333 U.S. 683, 702, 68 S.Ct. 793, 804, 92 L.Ed. 1010 (1948). Such expertise should not lightly be tossed aside. *Cf. Laird v. Tatum,* 409 U.S. 824, 837, 93 S.Ct. 7, 14–15, 34 L.Ed.2d 50 (1972) (memorandum by Justice Rehnquist).

---

**3.** Representatives from the LDCs noted a cold snap the previous December, discussed the general supply-and-demand picture for the Northeast, and urged that Iroquois' application be processed in a timely or expedited manner. Considering all these factors together, one might infer a circuitous attempt to impress upon the Commission the urgency of approving the Iroquois/Tennessee Project. It is, however, important to note that none of the factors mentioned by the representatives were news to the Commission. Moreover, in public letters to the Commission during the same time period, the industry representatives presented a more complete and direct argument for expedited consideration and approval.

■ In short, while there were meetings between agency officials and Iroquois and other industry officials, the record supports the Commission's conclusion that there was nothing improper about those meetings. Agency officials may meet with members of the industry both to facilitate settlement and to maintain the agency's knowledge of the industry it regulates. As this court has noted before, "such informal contacts between agencies and the public are the 'bread and butter' of the process of administration and are completely appropriate so long as they do not frustrate judicial review or raise serious questions of fairness." *HBO v. FCC,* 567 F.2d at 57. Because we find no evidence in the record indicating that judicial review has been frustrated or that any serious questions of fairness have been presented, we sustain the Commission's finding that "the integrity of the decisionmaking process has been fully maintained." Order No. 357 at 61,719.

### B

■ The Coalition petitioners support their other grievances with legal argument. Their primary claim is based upon due process. Focusing upon the August hearing, the Coalition contends that it was prevented from conducting either discovery or cross-examination upon the assumptions underlying the evidence submitted by Project supporters and relied upon by the Commission. As a consequence, the Coalition asserts, it was precluded from criticizing that evidence and, therefore, from effectively contesting Iroquois' application. The Commission's response is simple and compelling: even without the August hearings, the Coalition had all the process it was due.

According to the Commission, due process did not require the August hearing or indeed any additional proceedings. Opponents of the Project had ample opportunity to oppose the Project in written sub-missions and oral argument. In the Commission's view, the only thing they lacked was a trial-type evidentiary hearing, but, given the nature of the facts in dispute, there was no need for such a hearing. Trial-type proceedings, the Commission reasoned, are necessary only when "a witness' motive, intent, or credibility needs to be considered" or "where the issue involves a dispute over a past occurrence." Preliminary Order at 61,368. That was not the situation here. The Coalition and the sponsors of the Iroquois/Tennessee Project primarily dispute whether additional pipeline capacity is needed to meet future demand, a "purely technical issue" capable of being resolved not on the basis of a witness' motive or memory, but rather upon an "analysis of the conflicting data and a reasoned judgment as to what the data shows." *Id.* at 61,369; *see also* Order No. 357A at 61,346; Order No. 357 at 61,685. Because the Coalition petitioners had an adequate opportunity to present their case without the August hearing, the Commission concluded that due process was not violated by the abbreviated nature of that proceeding. Order No. 357 at 61,689.

The Coalition petitioners offer no real answer to this argument. Indeed, they concede that written submissions and documentary evidence should have been sufficient to resolve their factual disputes with the Project sponsors. Coalition Brief at 16, 25.[4] They do suggest that even before the August hearing they were denied a meaningful opportunity to test, criticize, and illuminate alleged flaws in the evidence submitted by Iroquois. *See, e.g., Morgan v. United States,* 304 U.S. 1, 18, 58 S.Ct. 773, 776, 82 L.Ed. 1129 (1938); *ICC v. Louisville & N.R.R.,* 227 U.S. 88, 93–94, 33 S.Ct. 185, 187–88, 57 L.Ed. 431 (1913). This, however, is belied by the record. The Coalition had adequate notice of the Iroquois/Tennessee applications, all of which were published in the FEDERAL REGISTER.

---

4. Because of this concession, we express no opinion on whether *Boston Carrier, Inc. v. ICC,* 728 F.2d 1508, 1511 n. 5 (D.C.Cir.1984), can or should be extended to cover certification proceedings under the Natural Gas Act. Nor need we consider whether the proceedings below were a formal adjudication under the Administrative Procedure Act entitling opponents of the Project to cross-examination. 5 U.S.C. § 556(d).

Preliminary Order at 61,534. They also had access to, and ample time to analyze, all the evidence of market need submitted by Iroquois and the LDCs planning to ship on the pipeline. Indeed, that evidence was available even before the Iroquois/Tennessee applications were submitted. Much of it had been introduced in other proceedings, including those before New York Public Service Commission, which were made part of the record in this case. Additional evidence was elicited during two public technical conferences, one held in connection with the Northeast open season and the other with the present application, and in response to the eleven data requests issued to Iroquois and the LDCs. *See supra* p. 1108.

The Coalition petitioners also had sufficient opportunity to criticize the evidence submitted by Iroquois and the LDCs. Indeed, they assert that they submitted "[s]ubstantial and specific factual predicates" contradicting that evidence. Coalition Brief at 24. Those "predicates" include several studies specially commissioned for the proceedings below (J.A. 464 (Technical Associates, Incorporated); *id.* at 564–628 (USI Incorporated)), general studies by governmental and industry bodies (Preliminary Order at 61,379 (Energy Information Administration)); (J.A. 481 n. 2 (North American Electric Reliability Council); *id.* at 570 (Gas Research Institute)), and calculations based upon the market projections submitted by the LDCs (*id.* at 440, 454–63, 570–71, 676–78). Not surprisingly, members of the Coalition also availed themselves of the opportunity to criticize thoroughly the manner in which Iroquois and other Project proponents analyzed those projections. *See, e.g., id.* at 431–32, 450–51, 496–97, 570, 632, 773–83.

In addition to receiving notice of the evidence upon which Iroquois relied, an opportunity to review it, and a chance to submit briefs criticizing it and evidence contradicting it, the Coalition was also able on July 17, 1990, to argue before the Commission. Given all these opportunities to present its case, the Coalition's assertion that it was denied a meaningful opportunity to be heard is unfounded.

Undaunted, petitioners maintain that these opportunities were illusory because they did not know the critical facts upon which the Commission relied. Specifically, the Coalition contends that it was unable to ascertain (either through discovery or cross-examination) the assumptions underlying the LDCs' projections of market need. This is simply inaccurate. In its data requests, the Commission specified certain assumptions and ordered the LDCs to reveal any additional assumptions they used in making their projections. J.A. 325. Thus, as counsel revealed in the August hearings, the Coalition's real worry is that there *may* have been additional, unstated assumptions. *Id.* at 327. If, however, the LDC market projections could not be evaluated without knowing those assumptions, the Coalition was free to criticize the projections as unsupported, which in fact it did several times. *Id.* at 570, 632, 665–73, 773–74. As a consequence, petitioners' complaints really go to the weight and the sufficiency of the evidence submitted by Iroquois and relied upon by the Commission, not to their lack of opportunity to test, criticize, and illuminate the flaws in that evidence. *See infra* p. 1115.

 Once it is established that even before the August hearing the Commission provided the Coalition with all the process it was due, the Coalition's other criticisms of the hearing are easily dismissed. Due process is sufficiently flexible to permit consideration of the August hearing in light of the proceedings that went before. *See, e.g., Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972); *Cafeteria & Restaurant Workers Union v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961). Since the Coalition petitioners had a meaningful opportunity to meet Iroquois' contentions before the August hearings, they can hardly argue that those supplemental hearings, no matter how expedited or limited, denied them such an opportunity.[5] Al-

---

**5.** This is not to say that absent the prior proceedings the Coalition's criticisms of the August

though these petitioners may have desired a greater opportunity to present their case than the limited nature of the August hearing provided, once due process is satisfied the amount and form of any additional process an agency wishes to provide is left almost entirely to its discretion. *See generally Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 543–44, 98 S.Ct. 1197, 1211–12, 55 L.Ed.2d 460 (1978). The Coalition's contention that it was denied due process must therefore be rejected.[6]

### C

▇▇▇▇▇ Reformulating the same basic complaints, the Coalition asserts that because it did not have an adequate opportunity to criticize the evidence submitted by Project proponents, the Commission's findings were not supported by substantial evidence as required by the Natural Gas Act. Natural Gas Act § 19(b), 15 U.S.C. § 717r(b). Under the substantial evidence test, the evidence relied upon by the agency must be substantial in light of the whole record. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951); *Association of Data Processing Serv. Orgs. v. Board of Governors of the Fed. Reserve Sys.,* 745 F.2d at

681–86. A corollary to the "the rule that the 'whole record' be considered" is that interested parties must have an opportunity "to introduce adverse evidence and criticize evidence introduced by others." *Mobil Oil Corp. v. FPC,* 483 F.2d 1238, 1258 (D.C.Cir.1973) (emphasis omitted); *see also Wisconsin Gas Co. v. FERC,* 770 F.2d 1144, 1167–68 & n. 38 (D.C.Cir.1985) (limiting *Mobil Oil* on other grounds), *cert. denied,* 476 U.S. 1114, 106 S.Ct. 1968, 90 L.Ed.2d 653 (1986). The Coalition petitioners contend that by denying them access to the assumptions underlying the LDCs' market data the Commission prevented the record from being sufficiently developed to support its conclusion. However, as discussed previously, petitioners did have access to the assumptions underlying the LDC projections. Furthermore, the Commission's conclusions were supported by the evidence in the record.

There was ample record evidence suggesting a need for the Iroquois/Tennessee Project. As mentioned before, each of the LDCs planning to ship natural gas on the Iroquois pipeline submitted market growth projections to the Commission indicating the need for at least as much capacity as the pipeline promised. Preliminary Order at 61,378. These projections fit comforta-

---

hearing would be valid. For example, their request to cross-examine Commission staff on the basis of their market need analysis was plainly improper; parties have no right to inquire into an agency's mental processes. *Morgan v. United States,* 304 U.S. at 18, 58 S.Ct. at 776; *De Cambra v. Rogers,* 189 U.S. 119, 122, 23 S.Ct. 519, 520, 47 L.Ed. 734 (1903).

**6.** The Coalition petitioners also assert that the Commission shifted the burden of proof onto them by setting forth its "current views" on the evidence and instructing the ALJ to take those views as his starting point in the August hearing. It is true that by noting that the evidence currently in the record favored the applicants, the Commission informed petitioners that they would have to produce additional evidence in order to make their case. However, the ultimate burden of persuasion remained with the applicants, Order No. 357A at 61,349–50; Order No. 357 at 61,690. The Commission's instructions were designed to benefit petitioners, "to focus the hearings and to give the parties a

meaningful opportunity to challenge or support [the Commissions current] views." *Id.*

We express no view on whether due process would be violated by a supplemental hearing that was a mere sham. The Coalition contends that the Commission's instructions to the ALJ predetermined his judgment. But the Coalition has failed to present any basis for supposing that the ALJ "heard the testimony with a deaf ear and a closed mind." *NLRB v. Donnelly Garment Co.,* 330 U.S. 219, 229, 67 S.Ct. 756, 762, 91 L.Ed. 854 (1947).

Finally, the Coalition argues that, by requiring the ALJ to start from the Commission's current views, the Commission forced the ALJ to prejudge the issues before him. In considering the evidence already in the record and the Commission's initial assessment of that evidence, the ALJ was in the same position as an ALJ, after reversal and remand, reconsidering a case (*Donnelly Garment Co.,* 330 U.S. at 236–37, 67 S.Ct. at 765). There is no reason here to think the ALJ's mind was closed to the evidence subsequently added to the record and, consequently, no showing that due process was violated.

bly within the range of projections made in more general regional forecasts. *Id.* at 61,380 & n. 108. The predicted growth rates were also consistent with historical data, with current evidence of supply deficiencies, and with the actual growth rate for 1989–90. *Id.* at 61,382; Order No. 357 at 61,695–96. Furthermore, the LDCs were willing to back up their analysis with action by entering into long-term sales and transportation agreements in connection with the Project, Preliminary Order at 61,382, and the state agencies charged with regulating them, after much scrutiny, approved those agreements. *Id.* at 61,382 n. 116.

In response to this evidence, the Coalition and other opponents of the Project submitted their own evidence and evaluations, all of which the Commission considered and rejected. Petitioners criticized the conclusions drawn from the LDC projections. While conceding that the overall projected growth rates were reasonable, opponents of the Project claimed that there was an unreasonably large "growth spike" between 1989–90 and 1991–92 in the LDC projections. The Commission dismissed this assertion because it was, for the most part, "derived from inaccurate comparisons of data." Order No. 357 at 61,695. The opponents had compared unadjusted historical and current data to projections adjusted for different weather conditions and for quantities of gas lost. *Id.* Moreover, the opponents' data did not consider the projected jumps in demand that would occur when new electric generation and cogeneration plants come on line. *Id.* at 61,695–96. The Commission rejected as well criticism of the historical growth data submitted by Project supporters. Because that data covered the period from 1978–89, opponents claimed that it overstated growth rates by measuring from the depths of a recession. The Commission found that despite this problem the data remains useful because it paralleled the eleven-year period being considered in connection with the Project and contains "a great number of data observations, including periods of curtailment and surplus, periods of high and low oil prices, and

periods of economic upturns and downturns." *Id.* (footnote omitted). More fundamentally, the Commission found that any distortion caused by the recession in 1978 would not affect the LDC projections because those projections are not extrapolated from historical data. *Id.* Finally, the Commission rejected the criticism that the LDC projections had been submitted in 1988 before the current economic downturn on the ground that those projections had been recently updated. *Id.* at 61,698.

As to the evidence submitted by opponents of the Project, the Commission observed that one study actually supported the LDCs' contention that additional supplies were necessary to meet peak demands. Preliminary Order at 61,379. The Commission also found flaws in the opponents' recalculation of the LDCs' data. These calculations, the Commission found, improperly focused upon peak months. As a consequence, the opponents' calculations neither indicated whether the current system could handle "needle peaks on certain cold days" nor reflected the way that LDCs plan their requirements. *Id.* at 61,381. In addition, these calculations were, in the Commission's opinion, based upon faulty premises. They ignored the desired and expected increase in electrical generation and cogeneration loads, the desirability of reliable service, and the public's interest in promoting competition among energy supplies and reducing dependence upon imported oil. *Id.* at 61,380; Order No. 357 at 61,695.

Finally, the Commission addressed the argument that "peak shaving facilities" that inject liquid natural gas and other fuels into natural gas pipelines could be relied upon to relieve any peak day deficiencies. It found the evidence submitted by Project opponents to be flawed on several grounds: among other things, the evidence assumed the use of facilities that had already been decommissioned, ignored concerns over the reliability of peak shaving supplies, and failed to consider technical limitations upon the amount of such supplies that could be used at once. Order No. 357 at 61,697.

In sum, the Commission thoroughly canvassed the evidence both for and against Iroquois' proposed pipeline and properly found a need for it. The Coalition's substantial evidence challenge must therefore be rejected.

**D**

■■■ Alternatively, the Coalition claims that the Commission violated the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321–4347, by failing to consider alternatives to shipping to the Northeast natural gas from the Pacific Coast of Canada.[7] Section 102(2)(C) of NEPA requires every proposal for major Federal action to include "a detailed statement by the responsible official on ... the environmental impact of the proposed action ... [and] alternatives to the proposed action...." 42 U.S.C. § 4332(2)(C). Because this requirement is "essentially procedural," in reviewing an agency's compliance with it courts need only "ensure that the statement contains sufficient discussion of the relevant issues and opposing viewpoints to enable the decisionmaker to take a 'hard look' at environmental factors, and to make a reasoned decision." *Natural Resources Defense Council, Inc. v. Hodel*, 865 F.2d 288, 295 (D.C.Cir.1988) (quotations omitted). The Commission's statement easily satisfies this standard. The final environmental impact statement discusses the major options to the Iroquois/Tennessee Project, and the draft environmental impact statement devotes a whole volume, totalling several hundred pages, to the options before the Commission. Petitioners

nevertheless criticize the final statement for failing to consider properly such options as using existing pipeline capacity, more "peak shaving," and conservation. However, the final statement does consider these choices. The statement questions reliance upon existing pipeline capacity on the ground that there are already capacity constraints during peak demand periods, finds the potential for conservation limited due to "existing technological, institutional, political, and social barriers," and expresses doubts about expanded use of peak shaving facilities because such facilities are neither cost-competitive nor efficient. J.A. 700–01, 703–05. The Commission also considered using a combination of these three options. *Id.* at 711–13. We therefore find that the Commission's environmental impact statement fulfilled NEPA's purpose of ensuring a "fully informed and well-considered decision." *Vermont Yankee v. Natural Resources Defense Council, Inc.*, 435 U.S. at 558, 98 S.Ct. at 1219.

**E**

In addition to questioning the manner in which the Commission conducted private meetings, the manner in which it conducted public hearings, the manner in which it discussed options, and the manner in which it analyzed the evidence before it, the Coalition petitioners also criticize the manner in which the Commission applied its own policies.[8]

■■■ 1. In its original application for the Project, Iroquois proposed to construct a lateral from its main pipeline to provide

7. The Coalition petitioners also contend that the final environmental impact statement improperly failed to consider the need for the Iroquois/Tennessee Project. This is only partially correct. While the ultimate determination of that issue was left to the Commission to resolve in its order, the final statement does contain a brief description of the need. J.A. 699. The regulations promulgated by the Council on Environmental Quality authorize agencies to avoid unnecessary duplication in just this manner. 40 C.F.R. § 1506.4.

8. Noting several flaws in Project applications, *see, e.g., supra* pp. 1108–09, the Coalition also contends that the Commission should have re-

jected them altogether pursuant to a regulation requiring applicants to "file all pertinent data and information necessary for a full and complete understanding of the proposed project." 18 C.F.R. § 157.5(a). We need not consider whether these contentions have any support in Commission regulations or policy. Because allegations of these errors were raised for the first time upon appeal, we lack jurisdiction over them. Natural Gas Act § 19(b), 15 U.S.C. § 717r(b). The Coalition's brief also offers several challenges in the name of Dr. Joyce Brothers concerning the proposed routing of the Iroquois pipeline near her house in upstate New York. Because Dr. Brothers has withdrawn those challenges, we do not consider them.

service directly to two LDCS, Connecticut Natural Service and Yankee Gas Services. During the Open Season settlement, Iroquois and Tennessee agreed that it would be more efficient for Tennessee to provide the same service. As part of that agreement, Iroquois proposed to pay for the transportation over Tennessee's pipeline. As a result, unlike other shippers on Iroquois who must pay all the costs of using the Tennessee system, Connecticut Natural and Yankee Gas would pay only a small percentage of the cost of their using the Tennessee, with the rest paid for by the other Iroquois shippers. Despite this cross-subsidization, the Commission approved the proposed rates because it was "reluctant to interfere with the parties' settlement of this issue when no customer allegedly disadvantaged by the relationship has complained." Order No. 357A at 61,-360.

The Coalition petitioners charge that by doing so the Commission acquiesced in a discriminatory rate. The Natural Gas Act only prohibits "undue preferences" and "unreasonable differences in rates." Natural Gas Act § 4(b), 15 U.S.C. § 717c(b). Observing the importance the Supreme Court has placed upon preserving private contractual arrangements (*United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.*, 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956); *FPC v. Sierra Pac. Power Co.*, 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956)), this court has upon several occasions noted that settlement agreements can justify a rate differential. *United Mun. Distribs. Group v. FERC*, 732 F.2d 202, 212 (D.C.Cir.1984); *Cities of Bethany, Bushnell, Cairo, Etc. v. FERC*, 727 F.2d 1131, 1139 (D.C.Cir.), *cert. denied*, 469 U.S. 917, 105 S.Ct. 293, 83 L.Ed.2d 229 (1984); *Boroughs of Chambersburg and Mont Alto v. FERC*, 580 F.2d 573, 577 (D.C.Cir. 1978) (per curiam). To qualify, the agreements must have been negotiated in good faith and must not unduly burden any group of customers. *United Mun. Distribs. Group v. FERC*, 732 F.2d at 212; *Cities of Bethany, Bushnell, Cairo, Etc. v. FERC*, 727 F.2d at 1139–40. Since the Commission had no evidence before it sug-

gesting the settlement agreements were either the product of improper conduct or placed an undue burden upon any customers, its determination that there was no undue discrimination is supported by substantial evidence and must therefore be upheld. Natural Gas Act § 19(b), 15 U.S.C. § 717r(b).

■■■ 2. The Coalition petitioners also contend that the Commission departed from its policy of setting a single depreciation rate for each pipeline system. In particular, although Tennessee's normal depreciation rate is 2.5 percent, the Commission approved a 5 percent annual rate of depreciation for certain pipeline loops built in connection with the main Iroquois pipeline. Order No. 357A at 61,364. There is nothing to the argument. The Commission has in the past authorized different depreciation rates for lateral pipelines devoted entirely to a single power plant on the ground that the depreciation rate of the lateral line should be the same as the rate for the power plant. *Tennessee Gas Pipeline Co.*, 45 F.E.R.C. ¶ 61,010, at 61,044–45 (1988). Here, the Commission found that because "the new Tennessee facilities are located downstream of a capacity bottleneck, which makes it unlikely the facilities could provide service to other customers," those facilities are "almost wholly limited to serving Iroquois shippers" and "dependent upon Iroquois' facilities." Order No. 357A at 61,364. Based upon these facts, the Commission reasonably concluded that the depreciation rate for the new Tennessee facilities should reflect the expected life of the Iroquois pipeline, not of the Tennessee system as a whole, and approved an annual depreciation rate of 5 percent, the rate for the Iroquois system. *Id.* Thus, contrary to the Coalition petitioners' contention, the Commission followed rather than departed from agency precedent in granting Tennessee a special depreciation rate for facilities constructed in connection with the Project.

### F

■■■ Finally, the Coalition petitioners directly attack the fairness of the Commission. Without citation to the record,

they charge Chairman Allday with saying at a meeting after the August hearing something to the effect that his job was to "put the pipe in the ground." Coalition Brief at 8. We are not sure what to make of this. We do not know what Chairman Allday said. For its part, the Commission described his statements as "expressing a general interest in expediting the regulation process." Opinion No. 357A at 61,355. It would take considerably more than the unsupported allegation in a brief to show that the Commission or any one of its members failed to act impartially. Under the well-settled presumption of administrative regularity, courts assume administrative officials "to be men [and women] of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances." *Withrow v. Larkin,* 421 U.S. at 55, 95 S.Ct. at 1468 (quoting *United States v. Morgan,* 313 U.S. at 421, 61 S.Ct. at 1004). Although that presumption can be rebutted, the evidence submitted must be far more compelling than a pattern of adverse but nonetheless justified discretionary decisions. *See, e.g., Association of Nat'l Advertisers, Inc. v. FTC,* 627 F.2d 1151, 1170 (D.C.Cir.1979), *cert. denied,* 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1113 (1980).

### III

In a second petition for review, the State of Louisiana and the Louisiana Association of Independent Producers and Royalty Owners (LAIPRO), together with several domestic oil and gas producers (who join petitioners' brief as intervenors), challenge the Commission's decision not to adjust Iroquois' transportation rates to offset the alleged competitive advantage that will otherwise accrue to the Canadian gas carried on the pipeline because of differences between Canadian and domestic rate design policies. Firm transportation rates in both Canada and the United States consist of two parts, a fixed monthly "demand" charge and an avoidable "commodity" charge imposed only on gas actually transported. Regulators in each country, however, use different methodologies to allocate costs between the two charges: Cana-

da's "fixed-variable" method allows pipelines to recover most of their fixed costs associated with transportation in the demand charge, while under FERC's "modified-fixed-variable" method domestic pipelines recover a large portion of their fixed costs through the commodity charge. According to petitioners, the resulting "rate tilt" (higher demand and lower commodity charges on Canadian gas) will give the imported gas carried on the Iroquois pipeline an unfair competitive advantage over domestic gas supplies.

In the proceedings below, the domestic producers urged the Commission to adjust Iroquois' rates to compensate for this alleged anticompetitive effect. They relied upon FERC's Order No. 256, *Natural Gas Pipeline Co.,* 37 F.E.R.C. ¶ 61,215 (1986), to support their proposition that domestic producers should not be disadvantaged by the interaction of domestic and Canadian rate structures. In Order No. 256, a pipeline that purchased and resold Canadian gas sought to pass through the costs of the gas to domestic buyers as-billed (that is, using the fixed-variable methodology); FERC disallowed the request and reallocated the costs in the resale agreements between the demand and commodity components to bring the rates in compliance with domestic policy. Arguing by analogy, the domestic producers in this case proposed a number of solutions to the alleged "rate tilt," all of which involved artificially increasing Iroquois' commodity charge. In Order No. 357, the Commission rejected these proposals, citing its policy against attempting to equalize all rate differentials between competing pipelines and concluding that it could not make an exception consistently with its obligations under the Canada–United States Free Trade Agreement, 27 I.L.M. 281 (1988) (Free Trade Agreement), without entering a regulatory morass. We are of the view that the Commission's reasoning adequately supports its decision not to adjust Iroquois' rates and therefore deny the petition for review on the "rate tilt" issue.

At the outset, we address an issue that has created some confusion in this case: FERC's jurisdiction to consider the interac-

tion of Canadian and domestic rate design policies vis-à-vis the authority of the Department of Energy's Fossil Energy office (DOE/FE) to regulate natural gas imports. We have discussed the respective responsibilities of the two agencies on previous occasions. *See TransCanada Pipelines, Ltd. v. FERC,* 878 F.2d 401, 405–06 (D.C.Cir.1989); *ANR Pipeline Co. v. FERC,* 876 F.2d 124, 131–32 (D.C.Cir.1989); *Wisconsin Gas Co. v. FERC,* 770 F.2d 1144, 1155–56 (D.C.Cir.1985), *cert. denied,* 476 U.S. 1114, 106 S.Ct. 1968, 90 L.Ed.2d 653 (1986). The Department of Energy Organization Act of 1977, Pub.L. No. 95–91, 91 Stat. 565 (codified as amended in scattered sections of 5, 7, 12, 15, and 42 U.S.C.), divided responsibility for enforcing the Natural Gas Act (NGA) between FERC and the Secretary of Energy. The Commission received general authority to issue individual certificates of public convenience and necessity under section 7 of the NGA, 15 U.S.C. § 717f, *see* 42 U.S.C. § 7172(a)(1)(D), but the Act made the Secretary of Energy responsible for regulating the importation of natural gas pursuant to section 3, 15 U.S.C. § 717b, *see* 42 U.S.C. § 7172 (transferring Federal Power Commission functions to FERC and omitting section 3 powers); *id.* § 7151(b) (vesting in the Secretary of Energy functions not transferred to FERC). In 1984 the Secretary of Energy delegated authority to administer section 3 to the Economic Regulatory Administration (ERA), *see* Delegation Order No. 0204–111, 49 Fed.Reg. 6690 (1984), and at the same time delegated to the Commission all functions related to imports under section 7, *see* Delegation Order No. 0204–112, *id.* Recently, the ERA's responsibility was transferred to DOE/FE.[9] *See* Delegation Order No. 0204–127, 54 Fed.Reg. 11,436 (1989).

Section 3 of the NGA provides that authorization for proposed natural gas imports shall issue if the imports are "consistent with the public interest." 15 U.S.C. § 717b. The Policy Guidelines accompanying the 1984 delegation orders instruct DOE/FE, when deciding whether a proposed import is consistent with the public interest, to consider the competitiveness of the import, the need for the gas, and the security of the supply. And DOE/FE, when it focuses on the competitiveness question, must consider whether the terms of the import arrangement taken as a whole will provide a supply of gas that will market competitively and whether the terms of the contract are sufficiently flexible to ensure competitiveness throughout the contract's duration. *See* New Policy Guidelines and Delegation Orders from Secretary of Energy to Economic Regulatory Administration and Federal Energy Regulatory Commission Relating to the Regulation of Imported Natural Gas, 49 Fed.Reg. 6684, 6687–88 (1984) (Policy Guidelines).

In this case, DOE/FE determined that the Canadian gas to be carried over the Iroquois pipeline would market competitively and that the import agreements were sufficiently flexible so that the gas would remain competitive.[10] *See Brooklyn Union Gas Co.,* 1 F.E. ¶ 70,285, at 71,211 (1990). It also addressed the "rate tilt" issue because the domestic producers raised that matter before it. The producers requested that DOE/FE correct for the alleged anticompetitive effect either by requiring the border price to be adjusted every six months to ensure that the demand component contained nothing that FERC would not allow domestic pipelines to recover through the demand component, or by making the import authorization contingent upon FERC's approving fixed-varia-

---

9. We will refer to ERA as DOE/FE throughout this opinion.

10. The agency first made preliminary conclusions regarding the competitiveness of the proposed imports and conditioned authorization on completion of a DOE review of the environmental impacts of the Iroquois project. *See Brooklyn Union Gas Co.,* 1 F.E. ¶ 70,285, at 71,218–19

(1990). Upon completion of the environmental review, DOE/FE authorized the import agreements in an opinion that adopted the agency's prior competitiveness findings. *See Brooklyn Union Gas Co.,* 1 F.E. ¶ 70,370, at 71,419–20 (1990). Rehearing was subsequently denied. *See Brooklyn Union Gas Co.,* 1 F.E. ¶ 70,400 (1991).

ble rates for domestic pipelines generally. *See id.* at 71,205.

DOE/FE determined that the domestic producers had failed to demonstrate that the alleged "rate tilt" rendered the import contracts as a whole uncompetitive. *See id.* at 71,212–13. It emphasized that parties opposing import contracts must overcome the presumption that "buyers and sellers of natural gas will construct competitive import arrangements that will be responsive to market forces over time," *id.* at 71,211, and that the Policy Guidelines disfavor unilateral alterations of freely negotiated agreements, *see id.* at 71,212. The agency pointed out that it (and federal courts) had previously authorized similar import contracts, including a virtually identical arrangement in *Boundary Gas, Inc.,* 1 E.R.A. ¶ 70,539 (1983), and it noted that the domestic producers had presented no evidence that the gas in that case "enjoyed an unfair competitive advantage over domestic supplies." *Brooklyn Union,* 1 F.E. at 71,205. DOE/FE recognized, however, that in a 1989 policy statement FERC "indicated a willingness to reconsider the modified-fixed variable rate in order to promote economic efficiency in natural gas markets" and stated that FERC "appears to be considering [opponents'] concerns." *Id.* at 71,216 (referring to *Interstate Natural Gas Pipeline Rate Design,* 47 F.E.R.C. ¶ 61,295 (1989)). It said that "[t]he DOE supports FERC's efforts to develop rate methodologies which will enhance efficiency and further the goal of competitive gas markets." *Id.* Because of the Commission's generic "ongoing review of pipeline rate design," DOE/FE concluded that it would be inappropriate for DOE/FE to adopt opponents' proposed conditions for this particular import arrangement. *Id.*

When the "rate tilt" issue was subsequently raised in section 7 proceedings before FERC, the Commission suggested in its Preliminary Order that it lacked jurisdiction to redress the alleged problem because DOE/FE had already considered the issue (which, in light of DOE/FE's deference to FERC, sounds a bit like the Alphonse–Gaston act). Under section 7, FERC may grant a certificate authorizing the transportation of imported gas if the proposed transportation "is or will be required by the present or future public convenience and necessity." 15 U.S.C. § 717f(e). Before issuing the certificate, it must "'evaluate *all* factors bearing on the public interest,'" *FPC v. Transcontinental Gas Pipe Line Corp.,* 365 U.S. 1, 8, 81 S.Ct. 435, 439, 5 L.Ed.2d 377 (1961) (*Transco*) (quoting *Atlantic Refining Co. v. Public Serv. Comm'n,* 360 U.S. 378, 391, 79 S.Ct. 1246, 1255, 3 L.Ed.2d 1312 (1959)) (emphasis in original), including the initial proposed rate, *see FPC v. Hunt,* 376 U.S. 515, 521, 84 S.Ct. 861, 865, 3 L.Ed.2d 1312 (1964); *Atlantic Refining Co. v. Public Serv. Comm'n,* 360 U.S. 378, 390–92, 79 S.Ct. 1246, 1254–55, 11 L.Ed.2d 878 (1952), and effects on competition, *see Northern Natural Gas Co. v. FPC,* 399 F.2d 953, 958, 961 (D.C.Cir.1968). But the Secretary of Energy's Policy Guidelines require FERC to exercise its section 7 authority over imports "in a manner consistent with the gas import policy determinations established by the Secretary." Policy Guidelines, 49 Fed.Reg. at 6688. As we have stated, "[t]he Commission cannot, consistent with the [Secretary's] Delegation Orders, take actions inconsistent with the terms, conditions, or policy considerations reflected in [DOE/FE's] section 3 import authorization." *Wisconsin Gas Co.,* 770 F.2d at 1155–56.

In its brief before this court, FERC contends that under this regulatory framework it lacked authority to respond to the domestic producers' concerns. It cites the conclusions set forth in the Preliminary Order and argues that our recent decisions in *ANR* and *TransCanada* support its position. Significantly, however, although the Preliminary Order correctly asserted that FERC had no jurisdiction to modify the underlying import agreements approved by DOE/FE, *see* Preliminary Order at 61,373–74, it did *not* contend that the Commission lacked authority to adjust Iroquois' transportation rates in order to offset the alleged competitive advantage. Under our precedents, it does not appear to us that

DOE/FE's decision would have prevented FERC from doing so.

In *ANR,* we affirmed the Commission's decision not to make an independent "public interest" finding regarding the importation of Canadian gas under section 7 on the ground that DOE/FE had already made such a finding pursuant to its section 3 authority. *See ANR,* 876 F.2d at 132–33. We recognized that under *Transco* "the Commission's transportation jurisdiction may reach issues beyond those directly concerned with the transportation," *id.* at 132, but held that when another federal agency has jurisdiction over a question and has decided that question, FERC has no obligation to duplicate the other agency's efforts. *See id.* ("[I]t would be a considerable stretch from [*Transco* ] to say that, in certifying transportation that is necessary to carry out a sale, the Commission is required to reconsider the very aspects of the sale that have been assessed by an agency specifically vested by Congress with authority over the subject."). We distinguished between FERC's direct consideration of the validity of import contracts approved by DOE/FE (which *ANR* petitioners apparently sought) and its consideration of other issues (whether or not also considered by DOE/FE) when determining matters such as transportation rates within the Commission's jurisdiction. *See id.*

This distinction proved decisive in *Trans-Canada.* That case presented two questions regarding FERC's jurisdiction vis-à-vis DOE/FE. The first was whether FERC properly declined to adjust the terms of an agreement between a domestic pipeline and its customer for the resale of Canadian gas. The customer argued that the pipeline could have acquired the gas from its Canadian supplier on better terms and should not be permitted to pass on to domestic consumers costs that were "imprudent[ly]" incurred. *TransCanada,* 878 F.2d at 406. We upheld as reasonable FERC's conclusion that it lacked authority to perform an independent "prudence" review of the terms of import contracts already authorized by DOE/FE, agreeing with the Commission that such review was prohibited because it could produce a deci-

sion inconsistent with DOE/FE's determinations. *See id.* at 407.

The second question in *TransCanada* was whether FERC acted within its authority when, in Order No. 256, it disallowed a pipeline to pass through to resale customers Canadian costs as-billed. In response, we held that DOE/FE's import authorizations did not deprive the Commission of jurisdiction. We observed that FERC's assertion of authority to reallocate costs in domestic sales contracts between the demand and commodity components "d[id] not require it to reevaluate the import contracts themselves." *Id.* at 409. In other words, the remedy adopted in Order No. 256 only required the Commission to examine the terms of the resale agreements before it and to ensure, by imposing a modified-fixed-variable rate structure, that Canadian gas was "treat[ed] ... no differently" from domestic gas. *Id.* at 410. We also noted that DOE/FE, in its authorization of the underlying import agreements, had recognized FERC's authority to take such corrective action, and we therefore concluded that FERC's reclassification of costs was not inconsistent with DOE/FE's determinations. *See id.* at 409–10. In sum, we determined that DOE/FE's finding that the imported gas would be competitive (that is, that there would be a market for it) did not preclude the Commission from making its own finding regarding anticompetitive effects. *See id.*

The question into which category— *ANR*/"prudence review" (no jurisdiction) or Order No. 256 (jurisdiction)—the Iroquois "rate tilt" issue falls is rather subtle, but we are persuaded that DOE/FE's authorization of the import agreements in this case did not preclude FERC from making an otherwise appropriate adjustment to Iroquois' rates. To be sure, unlike the situation in Order No. 256, DOE/FE did specifically address the anticompetitive effects argument here. And while in Order No. 256 the Commission simply looked at the rate structure before it and found that it deviated from domestic policy, in this case FERC would have had to examine the rate design contained in the import agree-

ments (and approved by DOE/FE) to justify departing from the standard modified-fixed-variable methodology proposed by Iroquois' proponents. Still, our case resembles Order No. 256 in another important respect emphasized in *TransCanada:* DOE/FE explicitly left open the possibility of FERC's responding to the domestic producers' concerns. We think that by citing FERC's 1989 Policy Statement and by declining to take corrective action in part because of FERC's "ongoing review of pipeline rate design," DOE/FE acknowledged and deferred to FERC's authority to remedy problems arising out of differences between Canadian and domestic rate structures. We therefore do not believe that FERC was foreclosed by DOE/FE's decision from adjusting Iroquois' rates.

■ We would thus be obliged to remand if, as the Commission's brief suggests, FERC actually based its decision not to adopt the domestic producers' proposals on a purported lack of jurisdiction. But FERC's only discussion of the jurisdictional question appears in its Preliminary Order, and in that order FERC specifically stated that its views on the appropriate rate design were only tentative and would be reconsidered in the August hearing. *See* Preliminary Order at 61,343–44. The Commission's final decision on this matter, Order No. 357, does not make the jurisdictional argument,[11] nor does the denial of rehearing, Order No. 357A, mention DOE/FE's authority over imports. For this reason, the jurisdictional issue cannot be a basis for either denying the petition for review or for remanding. *See SEC v. Chenery Corp.,* 318 U.S. 80, 87, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943).[12] We must instead examine the rationale actually presented in FERC's final order.

The Commission's decision in Order No. 357 not to adjust Iroquois' rates rests upon administrative convenience. When evaluat-

ing proposals for new supply projects, the Commission says, its policy is "to encourage proposals which increase the supply options of gas buyers and enhance competition," not to "protect existing suppliers from competition." Order No. 357 at 61,-701. FERC does not attempt to adjust for all rate differentials between competing pipelines; such differentials may exist for a variety of reasons and are, according to the Commission, administratively difficult to identify. FERC's policy is simply to ensure that a new pipeline's rate design does not give it an "unfair advantage." *Id.* at 61,701–02. It reasoned that it accomplished this goal here by imposing the same rate structure on Iroquois that it does on other domestic pipelines. *See id.* at 61,-701–03.

The domestic producers do not take issue with FERC's general policy against attempting to equalize all rate differentials between pipelines. Rather, they seem to contend that the Commission should have made an exception in this case because the competitive distortions arising from the interaction of Canadian and domestic rate structures are so large. The Commission's failure to do so, they further maintain, is inconsistent with Order No. 256. They also suggest that in refusing to consider the potential anticompetitive effects of the Iroquois project, FERC violated its statutory duty to take all public interest factors into account before issuing a section 7 certificate.

We think that the last argument mischaracterizes the Commission's decision. As the domestic producers themselves acknowledge, the Commission assumed that the alleged anticompetitive effects might result but declined for other reasons to adopt the proposed solutions. As to the suggestion that FERC erred in declining to depart from its general policy and adjust Iroquois' rates, the Commission explained

---

11. In the section devoted to the "rate tilt" issue, the only significant reference to DOE/FE appears in an expository subsection labeled *"Legal framework,"* in which the Commission explained in general terms the delegations to DOE/FE and to FERC. *See* Order No. 357 at 61,700.

12. Just as under *Chenery,* we do not give an agency the benefit of a *post hoc* rationale of counsel, an agency is not invariably splattered by its counsel's awkward brush strokes.

that it could not do so consistently with its responsibilities under the Free Trade Agreement. According to the Commission, consistency with the Agreement's "national treatment" obligation—which prohibits FERC from treating Canadian gas supplies less favorably than domestic gas supplies, *see* Free Trade Agreement, pt. 1, ch. 1, art. 105, pt. 2, ch. 5, art. 501, 27 I.L.M. at 294, 314 (incorporating the definition of "national treatment" in part II, article III of the General Agreement on Tariffs and Trade, 61 Stat. A5, A18–A19 (1947))—would require FERC to make the proposed detailed adjustments not only to pipelines transporting Canadian gas, but also to all domestic projects. FERC would have to analyze the demand and commodity charges in the transportation rates and underlying sales contracts for every project, and, if the commodity charges were lower than those of competitors, make the appropriate adjustment. It reasoned that such a detailed analysis would be inappropriate because it would create enormous administrative difficulties, including problems associated with obtaining information about rates subject to Canadian jurisdiction. *See* Order No. 357 at 61,703–05. The Commission distinguished this situation from the reallocation of costs undertaken in Order No. 256, which did not require examination of sales contracts to which the pipeline was not a party. *See id.* at 61,704. Order No. 357A reiterated these rationales, observing that in their petition for rehearing the domestic producers had failed to confront the practical problems that their proposals entailed. *See* Order No. 357A at 61,357–59.

FERC's explanation, although perhaps somewhat strained, passes the test of reasonableness. The Commission does not maintain that the Free Trade Agreement deprives it of *all* power to respond to the "rate tilt" problem; nor does the Commission argue that the Agreement requires it to adhere to a modified-fixed-variable rate design in every circumstance. As petitioners point out, FERC recently initiated rulemaking proceedings that include a proposal to require domestic pipelines to adopt the fixed-variable methodology, *see* Pipeline Service Obligations and Revisions to Regulations Governing Self-Implementing Transportation, 56 Fed.Reg. 38,372, 38,383–85 (1991)—a forum, we note, in which it would be appropriate for the Commission to consider systemic solutions to the domestic producers' concerns. FERC only argues here that its policy is not to undertake complex analyses to equalize all rate differentials between pipelines and that it cannot, consistently with the Free Trade Agreement, adopt the proposed conditions because they would (when applied to all domestic projects, as the "national treatment" obligation would require) result in a regulatory morass. The domestic producers deny this, but their denial is rather mushy. They "strongly doubt" that FERC would discover similarly significant distortions resulting directly from FERC's own policies in other contexts, but they have not refuted the Commission's assertion that the Free Trade Agreement would require it to apply the analysis proposed here to all domestic projects. And they have not rebutted FERC's argument that enormous administrative problems would follow.

We also do not believe that the Commission's refusal to adjust Iroquois' rates on these grounds is inconsistent with Order No. 256. In each case FERC required pipelines to adhere to domestic rate design policies. As FERC emphasized, in Order No. 256 it had to consider the anticompetitive effects of Canadian rate structures because those structures were incorporated into a domestic sales contract directly before the Commission; just as it did here, FERC only considered the particular rates before it. The corrective action taken in Order No. 256, moreover, did not give rise to the types of administrative difficulties present here. We therefore affirm the Commission's decision on the "rate tilt" issue.

## IV

■ The third and final petition for review was submitted by the Texas Eastern Transmission Company, one of four American pipeline companies with an interest in the Iroquois Limited Partnership. *See supra* p. 1107. Although Texas Eastern's

system is not physically connected to the Iroquois pipeline, Texas Eastern intends to participate in the Project by exchanging gas with Iroquois. Several of Iroquois' customers are in New Jersey, but since the Iroquois pipeline will terminate on Long Island, they cannot be directly served by the pipeline. Texas Eastern, which is physically connected to the New Jersey LDCs, has several customers in New York who could be served by the Iroquois. Accordingly, Texas Eastern has agreed to deliver domestic gas purchased by its customers in New York City to Iroquois' New Jersey customers in return for Iroquois delivering Canadian gas purchased by the New Jersey LDCs to Texas Eastern's New York customers. For its part in this "no fee" exchange, Texas Eastern plans to charge a small fee.

Section 7(c) of the Natural Gas Act requires companies wishing to transport gas to secure "a certificate of public convenience and necessity authorizing such acts or operations." 15 U.S.C. § 717f(c); *see also* 18 C.F.R. § 284.1(a) (defining transportation to include exchanges). The Commission must issue such certificates if three conditions are satisfied: "the applicant is able and willing properly to do the acts and to perform the service proposed," the applicant will follow the Commission's rules and regulations, and the proposed service "is or will be required by the present or future public convenience or necessity." Natural Gas Act § 7(e), 15 U.S.C. § 717f(e). The question here is whether Texas Eastern's application satisfies the third criteria.

Until recently, the Commission issued section 7(c) certificates primarily for specific transactions, like the proposed Texas Eastern–Iroquois exchange. Order No. 357 at 61,730. In 1985, hoping to open up the natural gas markets to greater competition by allowing LDCs to purchase natural gas directly from the wellhead, the Commission began issuing "blanket" certificates. *See, e.g., Associated Gas Distribs. v. FERC,* 824 F.2d 981, 993 (D.C.Cir.1987), *cert. denied,* 485 U.S. 1006, 108 S.Ct. 1468, 1469, 99 L.Ed.2d 698 (1988). These new certificates relieve their holders from the

time and expense of seeking individual certifications; in return for this regulatory relief holders of blanket certificates must provide transportation on a nondiscriminatory, open-access basis. *ANR Pipeline Co. v. FERC,* 876 F.2d 124, 127–28 (D.C.Cir. 1989); *Associated Gas Distribs. v. FERC,* 824 F.2d at 996. (Although section 4(b) of the Natural Gas Act, 15 U.S.C. § 717c(b), prohibits undue discrimination among customers, it does not prohibit a pipeline in all circumstances from refusing "to carry based on the would-be shipper's selling in competition with the pipeline." *ANR Pipeline Co. v. FERC,* 876 F.2d at 128 (citation omitted).) Finding it in the public interest to avoid processing redundant applications, and perhaps as well to encourage open-access transportation, the Commission has adopted, and this court has approved, a policy of denying case-specific section 7(c) certificates to pipelines that can already perform the same services under a blanket certificate. *Tennessee Gas Pipeline Co. v. FERC,* 898 F.2d 801, 804 (D.C.Cir.1990); *see also ANR Pipeline Co.,* 876 F.2d at 129 n. 3.

Based upon that policy, the Commission reasoned that "[n]o legal, policy, or administrative purpose would be served by continuing to process Texas Eastern's application for case-specific authority to perform the proposed exchange service, since Texas Eastern has full authority to perform under its blanket certificate." Preliminary Order at 61,396 (citation omitted); Order No. 357 at 61,731. The Commission acknowledged that it had in the past departed from this policy and granted case-specific certificates to pipelines already holding blanket certificates, but it noted that in each of those cases there had been construction related to the proposed transportation services. Order No. 357 at 61,731–32. In such cases, the Commission observed, it was appropriate to grant a case-specific certificate "as a basis for determining the term of depreciation of the facilities to be constructed or for allocation of their costs to particular beneficiaries of that transportation." *Id.* at 71,732. The Com-

mission found that exception inapplicable here.

■■■■ Texas Eastern seems to object to the Commission's decision on two grounds.[13] First, Texas Eastern argues that since its application is related to the construction of the Iroquois pipeline, it qualifies for the construction exception. However, the construction exception is only available if the construction is integrally related to the proposed transportation services. *Tennessee Gas Pipeline Co. v. FERC,* 898 F.2d at 805. In other words, the "public's convenience or necessity" requires the Commission to invoke the construction exception only when by doing so the Commission will insure a more equitable distribution of costs between the pipeline and its customers (through special depreciation rates) or between customers (by allocating construction expenses to those specifically benefiting from the construction). Order No. 357 at 61,732. Since neither consideration applies to Texas Eastern's proposed exchange, the Commission found the fact that the proposed exchange is tangentially related to a construction project to be irrelevant. Moreover, since the Commission is charged with administering the Natural Gas Act, and since its interpretation of that Act is reasonable, we defer to it. *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291–92, 108 S.Ct. 1811, 1817–

18, 100 L.Ed.2d 313 (1988); *Tennessee Gas Pipeline Co. v. FERC,* 898 F.2d at 804.

■■■■ Second, Texas Eastern argues that its blanket certificate does not cover the no-fee exchange services it plans to perform because it has not yet filed the tariff required for these charges under section 4(c) of the Natural Gas Act. 15 U.S.C. § 717c(c); *see generally Arkansas Louisiana Gas Co. v. Hall,* 453 U.S. 571, 577–78, 101 S.Ct. 2925, 2930–31, 69 L.Ed.2d 856 (1981). It is, however, hard to see how the presence or absence of such a filing makes any difference in a section 7(c) proceeding. After all, even if Texas Eastern were granted a case-specific certificate for the proposed exchange, it would still have to file a tariff before performing those services. The Commission reads section 4 rate filings and section 7(c) certifications as imposing entirely distinct obligations. Order No. 357A at 61,352. Since this reading is reasonable, we uphold it and deny Texas Eastern's petition for review.[14]

The petitions for review are denied.

---

**13.** Texas Eastern also tries to make other points. For example, it suggests that by requiring it to perform the exchange with Iroquois under its blanket certificate the Commission is somehow precluding it from charging already approved rates on other exchanges authorized under case-specific certificates. It is, however, undisputed that the blanket certificate will not affect those other exchanges until the case-specific certificates governing them expire. As a consequence, like the Commission, we are at a loss to see how the Commission's decision does what Texas Eastern claims it does. Order No. 357A at 61,-352. If the petitioner hopes for a favorable ruling on judicial review, it must at the very least make its criticisms of the agency's decision comprehensible.

**14.** Texas Eastern also notes that in recently approving a case-specific certificate for Iroquois, which holds a blanket certificate, the Commission mentioned that Iroquois had not yet filed a tariff for those services. *Iroquois Gas Transmission Sys.,* 55 F.E.R.C. ¶ 61,276, at 61,885

(1991); *Iroquois Gas Transmission Sys.,* 54 F.E.R.C. ¶ 61,285, at 61,812 (1991). While this is true, the Commission did not find the lack of a filed tariff to justify granting a case-specific certificate. Instead, it considered the lack of a tariff in the course of determining whether to invoke the construction exception. Application of that exception is not automatic: the Commission has ruled only that when transportation services are integrally related to new construction, "transaction specific certificate authority *may well be appropriate." Tennessee Gas Pipeline Co.,* 43 F.E.R.C. ¶ 61,042, at 61,126 (1988) (emphasis added). Accordingly, just as the Commission considered in deciding whether to exercise its discretion that "there is significant new construction involved which has yet to be completed," it also considered the fact that "the tariff by which transportation would be accepted and scheduled is not yet in effect." *Iroquois Transmission Sys.,* 54 F.E.R.C. at 61,812.