# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 27, 2004      Decided December 10, 2004

No. 03-1182

ELECTRIC POWER SUPPLY ASSOCIATION,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

MASSACHUSETTS MUNICIPAL WHOLESALE ELECTRIC
COMPANY, ET AL.,
INTERVENORS

———

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

———

*Robert C. Fallon* argued the cause for petitioner. With him on the briefs were *Larry F. Eisenstat*, *John Michael Adragna*, *Randolph Lee Elliott*, and *Scott H. Strauss*. *Julie Simon* entered an appearance.

*Robert H. Solomon*, Deputy Solicitor, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *Cynthia A. Marlette*, General Counsel, and *Dennis Lane*, Solicitor.

Before: EDWARDS and GARLAND, *Circuit Judges,* and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* EDWARDS.

EDWARDS, *Circuit Judge*: Section 557(d) of the Administrative Procedure Act ("APA"), enacted as part of the Government in the Sunshine Act, Pub. L. No. 94-409, § 4(a), 90 Stat. 1241, 1246 (1976) (the "Sunshine Act"), prohibits "*ex parte* communication[s] relevant to the merits of [a prescribed] proceeding" between an "interested person outside the agency" and an agency decision maker. 5 U.S.C. § 557(d)(1)(A), (B) (2000). The regulations of the Federal Energy Regulatory Commission (the "Commission" or "FERC") implementing § 557(d) are found at 18 C.F.R. § 385.2201 (2003) ("Rule 2201"). In this petition for review, the Electric Power Supply Association ("EPSA"), a national trade association representing participants in the competitive power industry, challenges two FERC orders purporting to amend Rule 2201 to exempt communications between private "market monitors" and FERC decisional employees from the Sunshine Act's ban on *ex parte* communications. *Communications with Commission-Approved Market Monitors*, 102 F.E.R.C. ¶ 61,041 (2003) ("*Initial Order*"), *reh'g denied*, 103 F.E.R.C. ¶ 61,151 (2003) ("*Rehearing Order*"). EPSA charges that FERC's proposed exemption, on its face, violates § 557(d).

The Commission argues that EPSA lacks standing to bring this challenge and, also, that EPSA's facial challenge is unripe for judicial review. On the merits, the Commission argues that the proposed exemption does not violate the Sunshine Act, because it effects a reasonable balance between the need for enhanced monitoring of national energy markets through timely reporting of market information with the need for

fairness and openness in Commission proceedings. We reject all of FERC's arguments and grant EPSA's petition for review.

We hold, first, that EPSA has standing to challenge the Commission's market monitor orders and that the challenge is ripe for review. We also hold that FERC's orders violate the clear mandate of the Sunshine Act. An agency may lawfully adopt regulations that faithfully implement the requirements of § 557(d). But no federal agency that is subject to the Sunshine Act is authorized to modify, abrogate, or otherwise violate the statutory ban on *ex parte* communications. Therefore, FERC's claim that it has an interest in receiving *ex parte* communications does not empower it to alter Congress' explicit proscription against such communications. Because FERC's market monitor exemption is plainly at odds with § 557(d), we grant EPSA's petition for review and vacate the Commission's orders.

## I. BACKGROUND

### A. *Statutory and Regulatory Background*

The Government in the Sunshine Act, 5 U.S.C. § 557(d) (2000), applies "when a hearing is required to be conducted in accordance with section 556 of [the APA]." *Id.* § 557(a). With certain limited exceptions not applicable here, § 556 sets forth the procedures to be used in cases in which proceedings are "required by statute to be determined on the record after opportunity for an agency hearing." *Id.* §§ 556(a), 554(a), 553(c). When such a hearing is required, the Government in the Sunshine Act provides:

> [N]o interested person outside the agency shall make or knowingly cause to be made to any member of the body comprising the agency, administrative law judge, or

other employee who is or may reasonably be expected to be involved in the decisional process of the proceeding, an *ex parte* communication relevant to the merits of the proceeding[.]

*Id.* § 557(d)(1)(A). An "*ex parte* communication" is defined as "an oral or written communication not on the public record with respect to which reasonable prior notice to all parties is not given, but it shall not include requests for status reports on any matter or proceeding covered by this subchapter." *Id.* § 551(14). When an *ex parte* communication occurs, the Sunshine Act requires disclosure of the communication and an opportunity for parties to file a response. *Id.* § 557(d)(1)(C). There are no exceptions to the disclosure requirement.

The controlling provisions of the Sunshine Act were fully explored over two decades ago in *Professional Air Traffic Controllers Organization v. FLRA*, 685 F.2d 547 (D.C. Cir. 1982) ("*PATCO*"). *PATCO* makes it clear that the sweep of the Sunshine Act is broad and that the statutory proscriptions are inviolate. Although the Act's prohibition applies only to communications to or from an "interested person outside the agency," Congress did not "intend . . . that the prohibition on *ex parte* communications would therefore have only a limited application." *Id.* at 562. Rather,

[t]he term "interested person" is intended to be a wide, inclusive term covering any individual or other person with an interest in the agency proceeding that is greater than the general interest the public as a whole may have. The interest need not be monetary, nor need a person to [sic] be a party to, or intervenor in, the agency proceeding to come under this section. The term includes, but is not limited to, parties, competitors, public officials, and nonprofit or public interest

organizations and associations with a special interest in the matter regulated. The term does not include a member of the public at large who makes a casual or general expression of opinion about a pending proceeding.

*Id.* at 562 (citations omitted).

*PATCO* also indicates that, while the communications subject to the Act are limited to those "relevant to the merits of the proceeding," the congressional reports underlying the Sunshine Act make it clear that the phrase should "be construed broadly and . . . include more than the phrase 'fact in issue' currently used in [§ 554(d)(1) of] the Administrative Procedure Act." *Id.* at 563 (citations omitted).

Finally, *PATCO* cautions that requests for status reports, which are explicitly exempted from the definition of *ex parte* communications, *see* 5 U.S.C. § 551(14), should not automatically be exempted from the Sunshine Act's prohibition. *See PATCO*, 685 F.2d at 563. The same is true with respect to communications characterized as "background information." The key to exclusion under the Sunshine Act is not the label given the communication, but rather whether there is a possibility that the communication could affect the agency's decision in a contested on-the-record proceeding. *See id.* This is clear from the legislative history underlying the Act:

The phrase [relevant to the merits of the proceeding] excludes procedural inquiries, such as requests for status reports, which will not have any effect on the way the case is decided. It excludes general background discussions about an entire industry which do not directly relate to specific agency adjudication involving a member of that industry, or to formal rulemaking

involving the industry as a whole. It is not the intent of this provision to cut an agency off from access to general information about an industry that an agency needs to exercise its regulatory responsibilities. So long as the communication containing such data does not directly discuss the merits of a pending adjudication it is not prohibited by this section.

However, a request for a status report or background discussion may in effect amount to an indirect or subtle effort to influence the substantive outcome of the proceedings. The judgment will have to be made whether a particular communication could affect the agency's decision on the merits. In doubtful cases the agency official should treat the communication as ex parte so as to protect the integrity of the decision making process.

H.R. REP. NO. 94-880, pt. 2, at 20 (1976), *reprinted in* 1976 U.S.C.C.A.N. 2212, 2229, *accord* S. REP. NO. 94-354, at 36-27 (1975).

In sum, *PATCO* plainly highlights the two distinct interests served by the Sunshine Act. First, the decision makes it clear that "[d]isclosure is important in its own right to prevent the appearance of impropriety from secret communications in a proceeding that is required to be decided on the record." *PATCO*, 685 F.2d at 563. Second, "[d]isclosure is also important as an instrument of fair decisionmaking; only if a party knows the arguments presented to a decisionmaker can the party respond effectively and ensure that its position is fairly considered." *Id.* These interests are not subject to compromise in agency regulations, orders, or proceedings.

**B.**     *FERC's Regulations*

FERC regulations implementing § 557(d) are found at 18 C.F.R. § 385.2201 (2003). The most recent version of these regulations, known as *Order No. 2201*, was adopted in 1999. *Regulations Governing Off-the-Record Communications,* F.E.R.C. Stats. & Regs., Regs. Preambles ¶ 31,079 (1999), *order on reh'g*, F.E.R.C. Stats. & Regs., Regs. Preambles ¶ 31,112 (2000). In January 2003, the Commission, by order, amended its *ex parte* regulations, purporting to exempt from the Sunshine Act communications between Commission-approved market monitors and Commission decisional staff in those situations in which a market monitor is not a party to and does not appear on behalf of a party to the on-the-record proceeding to which the *ex parte* communication relates. *Initial Order* at 61,088, 61,091. Under this purported exemption, an *ex parte* communication will only be memorialized and included in the official record of the relevant proceeding if the Commission determines that it relied on the *ex parte* communication in reaching a decision in an on-the-record proceeding. *Rehearing Order* at 61,526. The Commission explicitly acknowledged that exempted communications could involve matters that are at issue in ongoing on-the-record proceedings, *Initial Order* at 61,090, and that Commission-approved market monitors are "persons outside the agency," *id.* at 61,091.

Market monitor functions were endorsed by the Commission as part of its *Order No. 2000* initiative. In *Order No. 2000*, FERC directed all transmission owning utilities to participate in a regional transmission organization ("RTO"). *Regional Transmission Organizations*, F.E.R.C. Stats. & Regs., Regs. Preambles ¶ 31,089 (1999) ("*Order No. 2000*"), *order on reh'g*, *Order No. 2000-A*, F.E.R.C. Stats. & Regs., Regs. Preambles ¶ 31,092 (2000), *dismissed sub nom. Pub. Utility Dist. No. 1 v. FERC*, 272 F.3d 607 (D.C. Cir. 2001). RTOs, in

turn, were ordered to perform a market monitoring function to "'ensur[e] that markets within the region covered by an RTO do not result in wholesale transactions or operations that are unduly discriminatory or preferential or provide opportunity for the exercise of market power.'" Br. for Respondent at 5-6 (quoting *Order No. 2000*, F.E.R.C. Stats. & Regs., Regs. Preambles at 31,155). RTOs can choose to perform the monitoring function themselves or use an independent contractor. Br. for Respondent at 6 (citing *Order No. 2000*, F.E.R.C. Stats. & Regs., Regs. Preambles at 31,155-56).

"[M]arket monitors must report to the Commission objective information about RTO markets, evaluate the behavior of market participants, and recommend how markets can operate more competitively and efficiently." Br. for Respondent at 6 (citing *Order No. 2000*, F.E.R.C. Stats. & Regs., Regs. Preambles at 31,155-56). It is undisputed, however, that market monitors are private parties who work outside the agency. They are not hired, paid, or directly managed by FERC in their work.

**C.** *Procedural Background*

EPSA is a national trade association representing the competitive power industry. Its board includes 26 member companies. Eleven of the top 20 sellers of electricity nationwide are EPSA members. EPSA also includes numerous associate and supporting members, as well as state and regional entities representing the competitive power industry. EPSA members own generating facilities and market electricity in wholesale markets administered by RTOs and individual system operators ("ISOs"). On behalf of its members, EPSA advocates policies relating to the restructuring of the nation's electricity markets. As part of that effort, EPSA and its members regularly participate in contested FERC proceedings which affect wholesale markets administered by RTOs and ISOs. In 2002,

EPSA participated in 10 such proceedings. In 2003, it participated in 20. Given the significant investment of its members in electric generation and electricity markets, it is undisputed that EPSA is actively engaged in and will continue to be actively engaged in such contested FERC proceedings. Affidavit of Julie Simon, Vice Pres. of Policy, EPSA, (May 14, 2004) (submitted as an addendum to Br. for Petitioner).

Following the Commission's issuance of the initial order purporting to amend its *ex parte* regulations, petitioner EPSA sought rehearing, asserting, *inter alia*, that the market monitor exemption was contrary to § 557(d)(1). In an order issued in May 2003, the Commission rejected this argument. The Commission conceded that a market monitor may have an "interest in the outcome of a particular proceeding" to which his or her communication may be relevant, but contended that such an interest "does not make him [or her] an 'interested person' as that term is used in APA § 706(d)." *Rehearing Order* at 61,524. The Commission also noted that "market monitors may not be Commission employees," but argued that "they serve as the functional equivalent of such employees" and, thus, may be properly exempted from the requirements of § 557(d) just as Commission staff are exempt. *Id*. According to the Commission, "[c]ommunications with market monitors are similar to communications between Commission staff, which give no appearance of impropriety, nor lead to biased decision-making." *Id.*

Following issuance of the order denying its petition for rehearing, EPSA filed a petition for review before this court. The Commission responded with a motion to dismiss, arguing that EPSA lacked standing and that the case was, in any event, not ripe for review. EPSA, representing itself and the three intervenors in this suit, argues that the market monitor exemption, on its face, violates the Government in the Sunshine

Act. As it did below, EPSA also agues that the purported exemption violates the due process clause of the United States Constitution and that FERC's enactment of the modification by order, rather than notice-and-comment rulemaking, violated § 553 of the APA. Because we conclude that the market monitor exemption plainly violates the Sunshine Act, we need not reach EPSA's due process or notice-and-comment arguments.

## II. ANALYSIS

### A. *Standard of Review*

FERC's delegated authority does not include administration of the Sunshine Act. The Sunshine Act is a statute of general applicability governing FERC and all other federal agencies within its compass. FERC has no authority whatsoever to change the terms of the Act; rather, FERC must conform its regulatory activities to comply with the overriding terms of the Sunshine Act. Thus, we review *de novo* the legality of the Commission's modification of its *ex parte* regulations purporting to exempt market monitor communications from the requirements of the Sunshine Act. *See Ala. Rivers Alliance v. FERC*, 325 F.3d 290, 296-97 (D.C. Cir. 2003); *see also* 5 U.S.C. § 706(2)(A) (2000) ("The reviewing court shall . . . hold unlawful and set aside agency action found to be . . . not in accordance with law.").

### B. *Standing and Ripeness*

#### 1. *Standing*

The Commission's standing challenge is quite narrow and easily dismissed. No one, including FERC, doubts that EPSA and its members have a right to participate in contested FERC hearings when their financial interests are at stake.

Moreover, FERC does not contest EPSA's assertion that EPSA and its members, on the basis of their financial interests, routinely appear before FERC in contested hearings in which market monitors have an interest. Finally, FERC acknowledges that in challenging the market monitor exemption, EPSA is asserting the violation of certain procedural rights. Br. for Respondent at 18. Nevertheless, FERC maintains that EPSA does not have standing, because it "cannot demonstrate concrete and particularized harm to show that it is currently aggrieved by the challenged orders." Br. for Respondent at 16. Specifically, FERC argues that the market monitor exemption cannot cause current or future injury to the financial interests of EPSA or its members, because it is designed to enhance the competitiveness and efficiency of regulated markets. Br. for Respondent at 17-18. FERC's argument is entirely off the mark.

As regular participants in contested FERC hearings, EPSA and its members have a right, protected by the Sunshine Act's proscription against *ex parte* communications, to "fair decisionmaking" by the Commission. *See PATCO*, 685 F.2d at 563 ("Disclosure is also important as an instrument of fair decisionmaking; only if a party knows the arguments presented to a decisionmaker can the party respond effectively and ensure that its position is fairly considered."). This, not the financial interests of EPSA and its members, is the right directly protected by § 557(d) and impaired by the market monitor exemption. In complaining that the market monitor exemption violates the Sunshine Act, EPSA is seeking to enforce procedural requirements designed to protect EPSA's concrete interest in the outcome of hearings to which EPSA is a party. That being the case, EPSA's standing is not defeated by the fact that it cannot show, with any certainty, that its or its members' financial interests will be damaged by the operation of the market monitor exemption.

"[I]n cases involving alleged procedural errors, 'the plaintiff must show that the government act performed without the procedure in question will cause a distinct risk to a particularized interest of the plaintiff.'" *Wyoming Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 51 (D.C. Cir. 1999) (quoting *Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996)); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 553, 572 n.7 ("The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy."). EPSA has done this. If the Commission, following the market monitor exemption, were to engage in undisclosed *ex parte* communications with market monitors about matters relevant to a pending hearing to which EPSA or its members were parties or in which they had intervened, EPSA's and its members' particularized interests in fair decision making would be adversely affected.

2.      *Ripeness*

The Commission's ripeness argument is equally off base. Under the familiar two-prong test of A*bbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967), this case is clearly ripe for review. Contrary to what FERC alleges, EPSA is not challenging the "independence or motivations of Commission-approved market monitors." Br. for Respondent at 20. Rather, EPSA raises a straightforward legal question – whether the market monitor exemption, on its face, violates the requirements of the Sunshine Act. Moreover, it is apparent from the *Initial* and *Rehearing Orders* that FERC has promulgated the exemption in its final form. Both orders make clear that market monitor communications will be exempted from § 557(d)'s prohibition unless a market monitor is a party to or appears on behalf of a party to a proceeding. *Initial Order* at 61,091; *Rehearing Order* at 61,526. In its order on rehearing, the

Commission also made clear that it will not subsequently disclose any such communications unless the agency determines that it has relied on them in reaching a decision. *Id*.

No further factual development is necessary to clarify the issue before the court. The question raised by EPSA is currently fit for judicial review as it can be wholly resolved by an analysis of the Sunshine Act, the Act's legislative history, and its construction by relevant case law. *See Better Gov't Ass'n v. Dep't of State*, 780 F.2d 86, 92 (D.C. Cir. 1986). Thus, nothing would be gained by postponing resolution of EPSA's challenge.

The hardship prong under the ripeness doctrine is largely irrelevant in cases, such as this one, in which neither the agency nor the court have a significant interest in postponing review. *See Payne Enters., Inc. v. U.S.*, 837 F.2d 486, 493 (D.C. Cir. 1988). Nevertheless, were we required to consider whether EPSA has demonstrated a hardship sufficient to outweigh any possible institutional interest in deferring review, we would have no problem doing so. In light of EPSA's regular appearance as a party in contested Commission hearings, there can be no question that implementation of the market monitor exemption will have a "'direct and immediate' impact on the appellant[] that rises to the level of hardship." *Better Gov't Ass'n*, 780 F.2d at 93 (quoting *Abbott Labs.*, 387 U.S. at 152). The amendment involves regulations that have a direct effect on EPSA's ability to represent itself and its members in pending and future FERC hearings. It thus implicates EPSA's conduct in a way that is immediate. *See Better Gov't Ass'n*, 780 F.2d at 93 (citing *Toilet Goods Assoc., Inc. v. Gardner*, 387 U.S. 158, 164 (1967)); *accord Payne Enters.*, 837 F.2d at 493-94.

Moreover, this case does not resemble the situation posed in *Association of National Advertisers v. FTC*, 617 F.2d 611 (D.C. Cir. 1979), where advertisers and trade associations

sought interlocutory review of special rules promulgated by the FTC for use in some proceedings on television advertising aimed at children. Plaintiffs argued that FTC Rule 1.18 gave *sub silentio* approval to *ex parte* communications between Commissioners and members of the FTC's general staff, *id*. at 618, thereby violating this court's holding in *Home Box Office, Inc. v. FCC*, 567 F.2d 9 (D.C. Cir. 1977), that *ex parte* communication of information "relevant to a rulemaking" violated the due process clause, *id*. at 57. *But see Action for Children's Television v. FCC*, 564 F.2d 458, 474-78 (D.C. Cir. 1977) (narrowing *Home Box Office*); *Sierra Club v. Costle*, 657 F.2d 298, 400-02 (D.C. Cir. 1981) (similar). We rejected the claim as unripe, relying, in part, on the fact that the FTC had made it clear that it would include any staff comments "that pertain[ed]" to the rulemaking to "ensure[ ] that a court of appeals passing on a seasonably presented challenge will have a complete factual record to explore" the legal issues posed. *Nat'l Advertisers*, 617 F.2d at 620.

In this case, by contrast, FERC has made it clear that it will not include an *ex parte* communication in the official record unless it relies on the communication in reaching a decision in a contested proceeding. *Rehearing Order* at 61,526. Petitioner correctly notes that the Sunshine Act requires more. As we explain above, the Sunshine Act requires disclosure whenever an *ex parte* communication is "relevant to the merits" of the proceeding. In short, whereas the FTC in *National Advertisers* pledged to make public *all ex parte* communications that plaintiffs claimed were covered by *Home Box Office*, the Commission here has pledged to make public only *some* of the *ex parte* communications that petitioner claims are covered by the Sunshine Act. Thus, FERC cannot contend that petitioner's challenge is unripe. Indeed, in *Regular Common Carrier Conference v. United States*, 793 F.2d 376 (D.C. Cir. 1986), in

an opinion by then-Judge Scalia, we flatly rejected just such a claim by the Interstate Commerce Commission:

> As to ripeness: The Commission argues that petitioners should be required to wait until they actually suspect an FFTB member of abusing the new rule, file a complaint, seek discovery, and then, depending on the results of discovery, ask the Commission for help. But the gravamen of petitioners' complaint is that *any* use of the rule is an abuse, precisely because it does not permit petitioners and others to know what rates are being offered. When the very basis of attack is the secrecy of rates and hence the inability to challenge them, it would be absurd to hold the controversy unripe because petitioners cannot identify instances where the secret rates have been unreasonable or discriminatory.

*Id*. at 378-79. Here, too, it would be absurd to require EPSA to guess about when *secret* communications between market monitors and the Commission violate the Sunshine Act. The mere statement of the suggestion exposes its absurdity.

## C. *Application of the Sunshine Act*

On the merits, it is clear that the orders creating the market monitor exemption violate the explicit and sweeping proscription against *ex parte* communications contained in § 557(d). First, it is obvious that *ex parte* communications covered by the exemption are subject to § 557(d). The exemption is not limited to status inquiries and therefore does not escape the requirements of § 557(d) on that ground. *See* 5 U.S.C. § 551(14) (2000). Moreover, FERC does not argue that the exempted communications are outside the ambit of § 557(d) because they consist only of background information about the entire industry that does not directly relate to an agency

adjudication. Quite the contrary, in the *Initial Order*, the Commission made clear that in carrying out their reporting duties, market monitors undertake communications "relevant to the merits" of Commission proceedings. It said:

> In these [reporting] efforts, however, market monitors may encounter situations or matters that are also at issue in ongoing contested on-the-record proceedings at the Commission. While they may rightly need to bring such situations or matters promptly to the Commission's attention, or to discuss them with Commission staff, market monitors are currently prohibited from doing that off-the-record under Rule 2201. The reason is, as noted, Rule 2201 prohibits any communications on the merits of any issue in contested proceedings between decisional Commission staff members and any person outside the Commission.

*Initial Order* at 61,090. The Commission went on to explain that, because, in its view, the application of Rule 2201 in these circumstances was counterproductive to the Commission's goals, it was justified in modifying its regulations to "treat such communications as exempt communications not subject to disclosure or notice." *Id.*; *see also* Br. for Respondent at 28 (conceding that "some background discussions as to market conditions may relate to the merits of particular matters").

To the extent FERC suggests that the market monitor exemption is saved by its very limited disclosure requirement, this argument fails. The market monitor exemption requires disclosure only if the Commission determines that it relied on the *ex parte* market monitor communication in reaching a decision. The Sunshine Act, in contrast, requires disclosure, as a corrective measure, whenever an *ex parte* communication takes place. 5 U.S.C. § 557(d)(1)(C) (2000).

FERC also concedes that Commission-approved market monitors are "outside the agency." *Initial Order* at 61,091. And now, before the court, FERC appears to have abandoned its argument that "a Commission-approved market monitor's interest in the outcome of a particular proceeding does not make him an 'interested person' as that term is used in APA § 706(d)." *Rehearing Order* at 61,524. In its brief to the court, FERC refers only obliquely to this rationale, characterizing the market monitors' duties to stand apart from market participants and serve as the functional equivalent of Commission staff as nothing more than one of several limitations that the Commission imposed on market monitor communications to minimize the prejudice that they could cause in contested proceedings. Br. for Respondent at 29-31. FERC's abandonment of its "interested person" argument makes sense, because under the "wide, inclusive" definition of the term approved in *PATCO*, 685 F.2d at 562, it is clear that market monitors qualify as "interested persons" under the Sunshine Act. No one can reasonably argue that market monitors, who are charged with "ensuring that markets within [their assigned RTOs] do not result in wholesale transactions or operations that are unduly discriminatory or preferential or provide opportunity for the exercise of market power," Br. for Respondent at 5-6, do not have an interest in contested proceedings concerning their RTOs that is "greater than the general interest the public as a whole may have." *PATCO*, 685 F.2d at 562 (quotations and citation omitted).

FERC further concedes that "the Commission may not be entitled to special deference [from this court] in its construction of the [Sunshine Act]." Br. for Respondent at 23. Nevertheless, the agency inexplicably argues that its market monitor exemption should be assessed under the arbitrary and capricious standard of *Motor Vehicle Manufacturer's Ass'n v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43

(1983), and asserts that deference is due the exemption because it involves nothing more than FERC's interpretation of its own regulations.  Br. for Respondent at 22-23.  In other words, FERC argues that it is free to strike its *own* balance between its perceived need for timely information and the procedural fairness rules mandated by Congress in the Sunshine Act.  *See id*. at 24-37.  Accordingly, FERC justifies the market monitor amendment, which it essentially concedes is contrary to the requirements of § 557(d), by asserting that "[s]trict adherence to the *ex parte* rules, without an exemption for market monitoring, would be 'counterproductive' when market monitors need to bring market information to the Commission's attention, and would 'imped[e] its goal to receive as much timely information as possible from market monitors on the operation of energy markets.'"  *Id*. at 26 (quoting *Initial Order* at 61,090).  This entire line of analysis is patently wrong.

FERC can cite not a single case in support of its position.  Its reliance on *Home Box Office,* 567 F.2d at 57, in support of its putative right to strike a balance, Br. for Respondent at 24, and for the proposition that "informal contact between agencies and the public . . . are completely appropriate so long as they do not frustrate judicial review or raise serious questions of fairness," *id.* at 26-27, is completely misplaced.  *Home Box Office* was based on the due process clause, not the Sunshine Act.  As the court in *Home Box Office* noted, "the Sunshine Act by its terms does not apply here.  Its *ex parte* contact provisions are couched as an amendment to 5 U.S.C. § 557, and as such the rules do not apply to rulemaking under § 4 of the Administrative Procedure Act, 5 U.S.C. § 553." 567 F.2d at 56 n.125.  FERC's reliance on *Texas Office of Public Utility Counsel v. FCC*, 265 F.3d 313, 327 (5th Cir. 2001), and *Ass'n of National Advertisers, Inc. v. FTC*, 627 F.2d 1151, 1169 (D.C. Cir. 1979), *see* Br. for Respondent at 27 n.12, is similarly misplaced as the cited dicta from those cases also pertains to *ex parte* contacts in informal or

hybrid rulemaking proceedings that are not subject to the requirements of § 557(d).

The Commission's citation to *Louisiana Ass'n of Independent Producers and Royalty Owners v. FERC*, 958 F.2d 1101, 1112, 1113 (D.C. Cir. 1992), is also ill founded.  As FERC correctly  notes, that case supports the proposition that "[a]gency officials may meet with members of the industry . . . to maintain the agency's knowledge of the industry it regulates." Br. for Respondent at 27 (quotations and citation omitted); *see also id.* at 31, 32.  However, FERC fails to recognize that the court there explicitly found that the *ex parte* communications at issue did not violate § 557(d) because they were not relevant to the merits of the proceedings. *See La. Ass'n of Indep. Producers and Royalty Owners*, 958 F.2d at 1111-12 (citing *PATCO*, 695 F.2d at 563 (D.C. Cir. 1982)).  Moreover, as the court noted, "acting upon the chance that the industry representatives were attempting subtly and indirectly to influence the outcome of this proceeding, the Commission wisely placed summaries of these meetings in [the] record."  *Id.* at 1112.  This "apprised the petitioners of any argument that may have been presented privately, thereby maintaining the integrity of the process and curing any possible prejudice that the contacts may have caused." *Id.*

As EPSA argues, when an agency acts in violation of an express congressional mandate, its motives are irrelevant.  Br. for Petitioner at 14.  If, as is the case here, a statute of general applicability directs that certain procedures must be followed, an agency cannot modify or balance away what Congress has required of it.   The Commission is powerless to override Congress' directive banning *ex parte* communications relevant to pending on-the-record proceedings between decisional staff and interested persons outside the agency.   Consequently,

FERC's orders modifying its *ex parte* regulations must be reversed and vacated.

### III. CONCLUSION

For the foregoing reasons, we grant the petition for review and vacate the Commissions orders amending its *ex parte* regulations.