KAREN LeCRAFT HENDERSON, Circuit Judge,
dissenting.
I dissent from the majority opinion because I believe the appellees lack standing to bring this action under Article III of the United States Constitution. In McConnell v. FEC, 540 U.S. 93, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003), the United States Supreme Court iterated the “three requirements that constitute the ‘irreducible constitutional minimum’ of standing”:
First, a plaintiff must demonstrate an “injury in fact,” which is “concrete,” “distinct and palpable,” and “actual or imminent.” Second, a plaintiff must establish “a causal connection between the injury and the conduct complained of-the injury has to be ‘fairly trace[able] to the challenged action of the defendant, *116 and not ... th[e] result [of] some third party not before the court.’ ” Third, a plaintiff must show the “ ‘substantial likelihood’ that the requested relief will remedy the alleged injury in fact.”
540 U.S. at 225-26, 124 S.Ct. 619 (alteration original; internal citations omitted). The appellees have failed to make this minimum showing because they have not identified an actual or imminent, concrete injury-in-fact that is caused by the challenged regulations implementing the Bipartisan Campaign Reform Act of 2002 (BCRA), Pub.L. No. 107-155, 116 Stat. 81 (2002). Instead they speculate that they may suffer vaguely described, injuries at some future time. See Decís, of Shays and Meehan ¶¶ 6, 7, 8 (averring each appellee will be “impact[ed]” “as a candidate who runs in elections that could, be affected” by soft-money funding of “state and local activities that affect federal elections,” each “will be open to attack ... by .groups seeking to evade the contribution limits, source prohibitions, and disclosure requirements imposed by Congress” and opponents “will be able to interact and coordinate .... in [unidentified] ways that evade the contribution limits, source prohibitions, and disclosure requirements of federal law”) (emphases added). Or they complain of the subjective indignity of campaigning in a purportedly tainted electoral environment. See id. ¶¶ 4, 5 (averring each “will be forced’’ to run for reelection “in a system that is widely perceived to be, and [he] believefs] in many respects will be, significantly corrupted by the influence of special-interest money,” each “will face the strong risk that unregulated soft money contributions will again be used in an attempt to influence federal elections in which [he is] a candidate” and the soft-money contribution regulations “will affect the perception the public will form of me, my fellow office-holders, and fellow party members”). Such wispish injury claims fall far short of the injury showing required for Article III standing. See Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (to satisfy constitutional component of standing doctrine “injury alleged must be ... distinct and palpable, and not abstract or conjectural or hypothetical”) (internal quotations omitted). The majority attempts to fill the gaps in the appellees’ allegations by invoking two standing doctrines — conflated under the novel heading “illegal structuring of a competitive environment,” maj. op. 84, 85- — which neither the Supreme Court nor we have ever before applied in a similar context. In its eagerness to manufacture standing, the majority stretches both doctrines past their breaking points.
First, the majority finds standing based on the “procedural rights” cases. Under the procedural rights doctrine, courts have lowered the standing bar somewhat “in cases in which a party ‘has been accorded a procedural right to protect his concrete interests’” before an agency so that “the primary focus of the standing inquiry is not the imminence or redressability of the injury to the plaintiff, but whether a plaintiff who has suffered personal and particularized injury has sued a defendant who has caused that injury.” Fla. Audubon Soc’y v. Bentsen, 94 F.3d 658, 664 (D.C.Cir.1996) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 572 n. 7, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). In Electric Power Supply Ass’n v. FERC, 391 F.3d 1255 (D.C.Cir.2004), on which the majority relies, we applied the procedural rights doctrine to conclude that the Electric Power Supply Association (EPSA), a national trade association, and its members, which “routinely appear before FERC in contested hearings,” 391 F.3d at 1262, had standing to challenge a regulation creating an exception to the Sunshine *117 Act’s statutory prohibition on ex parte communications in agency proceedings, see 5 U.S.C. § 557(d)(1)(A), (B). The court reasoned that to establish standing, the plaintiffs did not need to show any certainty of financial loss because, “[a]s regular participants in contested FERC hearings, EPSA and its members have a right, protected by the Sunshine Act’s proscription against ex parte communications, to ‘fair decisionmaking’ by the Commission.” 391 F.3d at 1262 (quoting Prof'l Air Traffic Controllers Org. v. FLRA, 685 F.2d 547, 563 (D.C.Cir.1982)). Similarly, in cases challenging an agency’s refusal to prepare an environmental impact statement regarding a proposed federal project, we and other courts have found that a landowner whose property is threatened by the project has standing to challenge the agency’s refusal based on the Congress’s intent to protect the landowner’s procedural right to an environmental impact statement from the agency. See, e.g., Wyo. Outdoor Council v. U.S. Forest Serv., 165 F.3d 43, 51 (D.C.Cir.1999); see also Lujan v. Defenders of Wildlife, 504 U.S. 555, 572 n. 7, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (“[U]n-der our case law, one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency’s failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years.”). The majority finds such cases “analogous to” this one. Maj. op. 84-85. The analogy does not hold up.
In Electric Power, EPSA had standing to challenge the regulation because it was “seeking to enforce procedural requirements designed to protect [its] concrete interest in the outcome of hearings to which EPSA is a party.” 391 F.3d at 1262. EPSA enjoyed a procedural right to an administrative proceeding free from ex parte communications because it was the beneficiary of one of the two interests underlying the Sunshine Act — to ensure disclosure “ ‘as an instrument of fair deci-sionmaking,’ ” for “ ‘only if a party knows the arguments presented to a decisionmaker can the party respond effectively and ensure that its position is fairly considered.’ ” Id. (quoting Prof'l Air Traffic Controllers Org., 685 F.2d at 563). As the Supreme Court explained in Defenders of Wildlife, “ ‘procedural rights’ are special: The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy.” 504 U.S. at 573 n. 7, 112 S.Ct. 2130. The appellees do not qualify for this special relaxation of the usual injury standard for three reasons.
First, in the procedural rights cases, the courts have found a party has standing to challenge an agency decision which deprives the challenger of a procedural right that the Congress intended to protect in proceedings before the same agency. See Committee for Full Employment v. Blumenthal, 606 F.2d 1062, 1065 n. 11 (D.C.Cir.1979) (“On many occasions we have reviewed agency action or inaction at the request of a party who alleged that its procedural rights (as created either by the agency’s own regulations, or the Administrative Procedure Act) had been violated.”). In Electric Power, for example, we concluded that the EPSA and its members had standing to seek review of the decision by the Federal Energy Regulatory Commission to permit ex parte communication in its own proceedings which the Congress had intended to prohibit in the Sunshine Act in order to protect the right of fair decisionmaking in proceedings before the Federal Energy Regulatory Commission. See Electric Power, 391 F.3d at 1262 (“As *118 regular participants in contested FERC hearings, EPSA and its members have a right, protected by the Sunshine Act’s proscription against ex parte communications, to ‘fair decisionmaking’ by the Commission.”) (emphasis added). Similarly, in the cases challenging an agency’s refusal to prepare an environmental impact statement regarding a proposed federal project, to which the Supreme Court alluded in Defenders of Wildlife, see maj. op. 91 - 92, courts have found that a landowner whose property is threatened by the project has standing to challenge the agency’s refusal based on the Congress’s intent to protect the landowner’s procedural right to obtain an environmental impact statement from the agency undertaking the project. Here, there is no' such connection between the FEC or its rulemaking proceeding and the “procedural right” allegedly denied the ap-pellees. The majority finds the appellee congressmen have standing to challenge the FEC’s rulemaking procedure based not on a right to some guaranteed procedural protection before the Commission but rather on an “interest in ‘fair’ reelection fights” in future public elections. See maj. op. 91. This unprecedented reliance on a right independent of any agency proceeding turns the procedural rights doctrine on its head and creates a wholly new and insupportable theory of standing.
Second, even assuming candidates could have standing to challenge an agency proceeding based on a procedural right available and violable only in a future election campaign, BCRA accords no such special right to the appellees or to any other candidate.[1] because BCRA’s requirements were not designed to protect any interest, much less a concrete interest, belonging to a candidate in his capacity as candidate (as opposed to his capacity , as voter). See Fla. Audubon Soc’y, 94 F.3d at 658 (“According to Defenders of Wildlife, a plaintiff may have standing to challenge the failure of an agency to abide by a procedural requirement only if that requirement was ‘designed to protect some threatened concrete interest’ - of the plaintiff.” (quoting Defenders of Wildlife, 504 U.S. at 573 n. 8, 112 S.Ct. 2130; emphasis added)). In Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), the Supreme Court determined that the “primary purpose” of the Federal Election Campaign Act of 1971 (FECA), which BCRA amends, was “ ‘to limit the actuality and appearance of corruption resulting from large individual financial contributions,’ ” McConnell, 540 U.S. at 120, 124 S.Ct. 619 (quoting Buck *119 ley, 424 U.S. at 26, 96 S.Ct. 612), by which “the integrity of our system of representative democracy is undermined,” Buckley, 424 U.S. at 26-27, 96 S.Ct. 612. The Buckley Court found, the McConnell Court noted, that FECA’s substantive contribution limits “serve[ ] an interest in protecting ‘the integrity of our system of representative democracy.’ ” 540 U.S. at 120, 124 S.Ct. 619 (quoting Buckley, 424 U.S. at 26-27, 96 S.Ct. 612). Those BCRA provisions which may be considered “procedural” — 'that is, the provisions governing disclosure, recordkeeping and reporting— “vindieate[ ] three important interests: providing the electorate with relevant information about the candidates and their supporters; deterring actual corruption and discouraging, the use of money for improper purposes; and facilitating enforcement of the prohibitions in the Act.” McConnell, 540 U.S. at 121, 124 S.Ct. 619 (citing Buckley, 424 U.S. at 66-68, 96 S.Ct. 612). None of these interests accrues to candidates qua candidates. The first two plainly benefit the general electorate; as the Court explained in Buckley, “[a] public armed with information about a candidate’s most generous supporters is better able to detect any post-election special favors that may be given in return.” Buckley v. Valeo, 424 U.S. at 67, 96 S.Ct. 612. As for the third, “recordkeeping, reporting and disclosure requirements are an essential means of gathering the data necessary to detect violations of the contribution limitations,” Buckley, 424 U.S. at 67-68, 96 S.Ct. 612, thereby serving FECA’s primary — public—interest in reducing corruption and its appearance by limiting contributions. Thus, BCRA’s procedural provisions were designed to protect only the rights of voters generally to be informed about candidates and to exercise their franchise in an electoral system untainted (or less tainted) by corruption. They were not designed to benefit or protect candidates running for ■ office. Because each congressman appellee is “claiming only harm to his and every citizen’s. interest in proper application of the Constitution and laws, and seeking relief that no moré directly and tangibly benefits him than it does the public at large,” he “does not state an Article III case or controversy;” Defenders of Wildlife, 504 U.S. at 573-74, 112 S.Ct. 2130. In short, he has no more standing than any other voter — which is to say none.[2]
•To support a candidate’s standing to challenge a campaign finance law violation under the procedural rights doctrine, the majority cites the example in Defenders of a landowner who has a procedural right to challenge an agency’s failure to prepare an environmental impact statement regarding a proposed dam on land adjacent to his own. But there is a key distinction. The landowner has a concrete, particularized claim — beyond the general public’s — to the interest which the environmental assessment requirements were designed to protect: his particular corner of .the environment may be adversely affected by the dam because of its proximity. Thus, he has standing “even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will no't be completed for many years.” Defenders of Wildlife, 504 U.S. at 573 n. 7, 112 S.Ct. 2130. A candidate for public office, however, has no such special claim to the interest advanced by BCRA. — -namely, preserving the integrity of our system of government by eliminating corruption. *120 With regard to this interest, he is like one of those “persons who live (and propose to live) at the other end of the country from the dam” and therefore “have no concrete interests affected.” Defenders of Wildlife, 504 U.S. at 573 n. 7, 112 S.Ct. 2130.[3]
Finally, to the extent that BCRA creates any procedural protections (and I would be reluctant to characterize BCRA’s disclosure, recordkeeping and reporting requirements as “protections” for candidates), it is not the regulations’ procedural requirements that cause the appellees’ alleged injuries but rather the purported relaxation of BCRA’s substantive restrictions on contributions and expenditures. See supra p. 116 (quoting from the appellees’ declarations).
In addition to the procedural rights cases, the majority also finds standing based on a line of cases establishing “the rule ... that when [a] particular statutory provision invoked [ ] reflects] a legislative purpose to protect a competitive interest, the injured competitor has standing to require compliance with that provision.” Hardin v. Ky. Utils. Co., 390 U.S. 1, 6, 88 S.Ct. 651, 19 L.Ed.2d 787 (1968) (citations omitted). The majority’s competitive standing theory also suffers from three fatal defects.[4]
First, as I just explained, BCRA does not “reflect a legislative purpose to protect a competitive interest” of the appellees; for the provisions the appellees seek to enforce are “in no way concerned with protecting against competitive injury.” Hardin, 390 U.S. at 6, 88 S.Ct. 651 (explaining cases in which court found no standing notwithstanding existence of competitive economic injury).
Second, the Commission’s regulations have not caused the appellees a competitive injury. In Association of Data Processing Serv. Orgs. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), cited at maj. op. 86, the Supreme Court found sufficient injury-in-fact under Article III because the petitioners experienced increased competition for their customers as a result of the challenged government ac *121 tion.[5] The Supreme Court held that the petitioners, data processing service providers, had standing to challenge a ruling by the Comptroller of the Currency that authorized national banks to provide data processing services to other banks and to bank customers because the petitioner “not only allege[d] that competition by national banks in the business of providing-data processing services might entail some future loss of profits for the petitioners, they also allege[d] that respondent American National Bank & Trust Company was performing or preparing to perform such services for two customers for whom petitioner Data Systems, Inc., had previously agreed or negotiated to perform such services.” 397 U.S. at 152, 90 S.Ct. 827. As the majority acknowledges, however, the appellees have suffered no increased competition as a result of the Commission’s regulations which “create neither more nor different rival candidates.” Maj. op. 86. The majority also concedes that the regulations offer no “special benefits” to the appellees’ rivals so as to implicate the other basis for competitive standing: creating marketplace advantage for competitors. Id.; see, e.g., DIRECTV, Inc. v. FCC, 110 F.3d 816, 830 (D.C.Cir.1997) (holding prospective auction bidder had standing to challenge rule that put it at “a substantial competitive disadvantage vis-a-vis other bidders”). As in McConnell, because the challenged action neither confers a ■ competitive benefit on competing candidates nor subjects the appellees to any competitive disadvantage, the appellees lack Article III standing.
In McConnell, the “Adams plaintiffs” alleged their candidates suffered a “competitive injury” from section 307 of BCRA which increased the ceiling on certain individual contributions, unconstitutionally in their view. As injury they alleged that under section 307 their candidates would be at a “ ‘fundraising disadvantage’ ” given that they “ ‘d[id] not wish to solicit or accept large campaign contributions as permitted by BCRA’ because ‘[t]hey believe such contributions create the appearance of unequal access and influence.’ ” 540 U.S. at 228, 124 S.Ct. 619 (quoting Adams plaintiffs’ complaint). The Court rejected this argument because the candidates’ ’’alleged inability to compete stems not from the operation of § 307, but from their own personal ‘wish’ not to solicit or accept large contributions, i.e., their personal choice.” 540 U.S. at 228, 124 S.Ct. 619. Here too, any competitive injury the appellees may suffer stems not from the FEC’s regulations but from their own refusal to take advantage of them. Under the Commission’s regulations, the appellees are authorized to employ the same campaign tactics in the same manner as any other federal candidate. The majority attempts to distinguish the Adams plaintiffs’ plight by claiming that “because being put to the choice of either violating BCRA or suffering disadvantage in their campaign is itself a predicament the statuté spares them, having to make that choice constitutes Article III injury.” Maj. op 89. But this is the same “predicament” the Adams plaintiffs asserted: they would be outspent unless they chose to accept the higher hard money contributions authorized by BCRA, which, they maintained, violated the United States Constitution. They faced their Hobson’s choice only because, in their view, BCRA “permit[s] what [the Fifth Amendment] forbids.” See maj. op. 93. In short, the two appellees have identified *122 no competitive injury they will suffer as a consequence of the challenged regulations; if the FEC “alter[ed] the competitive environment’s overall rules,” maj. op. 86, it did so for all candidates, including the appel-lees, thereby maintaining a level playing field. Lacking a competitive injury, the appellees’ only complaint is of injury to their generalized, abstract interests in enforcing BCRA as they believe it was meant to be implemented and in preventing the appearance or occurrence of corruption. Neither interest supports standing. See Common Cause v. FEC, 108 F.3d 413, 418 (D.C.Cir.1997) (stating court cannot “rec-ogniz[e] a justiciable interest in the enforcement of the law” and noting “Congress cannot, consistent with Article III, create standing by conferring ‘upon all persons ... an abstract, self-contained, noninstrumental “right” to have the Executive observe the procedures required by law,’ ” (quoting Defenders of Wildlife, 504 U.S. at 573, 112 S.Ct. 2130) (emphasis original); Rainbow/PUSH Coalition v. FCC, 396 F.3d 1235, 1241 (D.C.Cir.2005) (finding injury from discrimination at local public radio station was insufficient for standing because it was “simply a setback to [an] abstract social interest’ in advancing racial equity” (quoting Havens Realty Corp. v. Coleman, 455 U.S. 363, 379, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982))).
In the absence of either of the two established bases for competitive standing— increased competition and competitive advantage/disadvantage — the only competitive “injury” the majority identifies is the vague, hypothetical and novel “intensified competition” injury, maj. op. 86 (emphasis original). Specifically, the majority cites regulations permitting unrestricted coordinated expenditures to be made more than 120 days before an election and relieving non-federal political party committees from allocating expenses for employees devoting less than 25% of their time to federal election activity between federal and non-federal expenditures. These regulations do not, as the majority states, require the appellees to “respond to a broader range of competitive tactics” or to “account for additional practices.” Maj. op. 86 (emphases added). Even under the appellees’ interpretation, BCRA indisputably permits both soft-money-funded coordinated expenditures and use of non-federal committee employees for federal election activity; the regulations simply permit more of these same activities than the appellees believe BCRA authorizes. How these regulations “intensify” the ap-pellees’ competition, whether and to what extent rival candidates may avail themselves of the so-called “safe harbors” or their increased use of them will affect the outcome of the appellees’ reelection campaigns, is anyone’s guess. Notably, neither the appellees nor the majority cites any instance when the safe harbors were exploited to a candidate’s detriment in the 2004 election campaigns. In short, the majority’s “intensified competition” is precisely the sort of vague and speculative injury that Article Ill’s case or controversy requirement forbids.
Third, the majority’s competitive standing theory fails because, as the district court noted, the appellees did not allege a specific competitive injury in their declarations or elsewhere. See Shays v. FEC, 337 F.Supp.2d 28, 45 n. 12 (2004); Sierra Club v. EPA 292 F.3d 895, 899 (D.C.Cir.2002) (burden is on party asserting standing to “identify in th[e] record evidence sufficient to support its standing”).
Finally, the majority is simply wrong if it means to suggest that the two congressmen have standing solely because they are “directly regulated parties,” maj. op. 94. The appellees claim injury not from any regulation of their activities under BCRA *123 or the FEC’s regulations but rather from the way that other candidates will be regulated (or not). It is clear from the Supreme Court’s decision in McConnell that injury does not arise automatically from the simple fact of being subject to regulation under a particular regime. As a senator raising funds to run for reelection, McConnell was plainly “directly regulated” by BCRA. Yet the Supreme Court found he lacked standing to challenge section 305 of BCRA because he failed to carry his burden to “demonstrate an ‘injury in fact,’ which is ‘concrete,’ ‘distinct and palpable,’ and ‘actual or imminent.’ ” McConnell, 540 U.S. at 225, 124 S.Ct. 619. The defect noted in McConnell’s case was the temporal remoteness of his claimed injury, which related to an election then 6 years off — an unlikely stumbling block for congressmen such as the appellees who are elected biennially. Nonetheless, the treatment of McConnell is relevant here because the Court refused to assume his standing simply because he is “directly regulated” by BCRA. He was still required to point to some specific injury that satisfied all of the standing requirements. The appellee congressmen here are likewise required to identify some specific injury arising from the regulations in order to satisfy Article Ill’s requirements. Because they failed to do so, I would vacate the district court’s decision and dismiss this action for lack of standing.[6]

. I know of no authority to support the majority’s suggestion, maj. op. 88-89, that if the appellees come within BCRA’s "zone of interests” for prudential standing'under the APA — • a requirement the majority acknowledges is '[n]ever especially demanding,' ” maj. op. 83 (quoting Amgen, Inc. v. Smith, 357 F.3d 103, 108 (D.C.Cir.2004)) — they necessarily have standing under Article III as well. See Bennett v. Spear, 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (zone of interests requirement is part of "a set of prudential principles that bear on the question of standing” "[i]n addition to the immutable requirements of Article III”). It is true that the Congress "may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute,” Linda R.S. v. Richard D., 410 U.S. 614, 617 n. 3, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973), quoted at maj. op. 89, but to do so it must under Electric Power and the other procedural rights cases have "designed” the statute with the purpose to confer a right or benefit on the party asserting the right. See also infra at 120 (discussing competitive injury standing and need for legislative intent to confer it). This legislative purpose standard is more stringent than the "zone of interests" inquiry in which "there need be no indication of congressional purpose to benefit the would-be plaintiff.” Clarke v. Secs. Indus. Ass’n, 479 U.S. 388, 399-400, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987) (analyzing zone of interests to establish prudential standing).

. The majority offers no support for its bald statement that BCRA “specifically protects the interest in fair reelection contests that Shays and Meehan assert.” Maj. op. 89 (emphasis added).

. In this respect, the majority's characterization of Defenders’ persons living "at the other end of the country” as "a far cry from” from the appellees is wrong. See maj. op. 87 - 88. The appellees are in the same position as any voter and have no more personal stake in enforcing BCRA than Defenders’ remote landowner would in enforcing environmental assessment requirements.

. In the past we have consistently viewed competitor standing in the political arena with skepticism. See Gottlieb v. FEC, 143 F,3d 618, 620 (D.C.Cir.1998) ("As to Ameri-PAC's 'political competitor' theory, we have never completely resolved this 'thorny issue.' " (quoting Common Cause v. FEC, 108 F.3d 413, 419 n. 1 (D.C.Cir.1997)); citing Akins v. FEC, 101 F.3d 731, 737 (D.C.Cir.1997) (en banc), vacated, 524 U.S. 11, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998); Fulani v. Brady, 935 F.2d 1324 (D.C.Cir.1991)). In Gottlieb, on which the majority relies, maj. op. 87, the court rejected the competitive standing claim of a political action committee challenging a candidate’s receipt of federal matching funds, citing our decision in Fulani, in which we had similarly rejected a third party candidate's challenge to the tax exempt status of a presidential debate sponsor. The Gottlieb court noted that in Fulani "[w]e speculated that '[ajrguably ' Fulani would have had standing ‘if the IRS were depriving Fulani of a benefit that it afforded to others similarly placed.' " 143 F.3d at 621 (quoting Fulani, 935 F.2d at 1328) (emphases added). I do not agree with the majority that the court's finding that the plaintiff lacked standing, particularly in light of the quoted language, "supports applying competitive standing to politics as well as business.” Maj. Op. 87. Even assuming, however, that competitive injury standing is viable in the political context, the appellees are, like the plaintiffs in Gottlieb and Fulani, “not in a position,” Gottlieb, 143 F.3d at 620, to claim competitive standing because, as I explain below, they have not alleged a competitive injury.

. In Clarke v. Secs. Indus. Ass'n, 479 U.S. 388, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987), and National Credit Union Admin, v. First Nat'l Bank & Trust Co., 522 U.S. 479, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998), cited along with Data Processing, maj. op. 85-86, the Supreme Court addressed only prudential, not constitutional, standing. See supra n. 1.

. I do not agree with the majority that under this view “Shays and Meehan would never have standing to challenge these rules,” not even under FECA’s judicial review provision, 2 U.S.C. § 437g(a)(8), which permits a private party to challenge in the district court the Commission’s decision not to enforce FECA. See maj. op. 94. This provision does what BCRA does not; once an actual campaign finance violation has been alleged, it confers on a complainant a procedural right to have the FEC review it. If the FEC offends the right, the party has standing to seek redress in court.